1
2
3              UNITED STATES DISTRICT COURT
4                   DISTRICT OF NEVADA
5                          * * *
6   CHARLES SHEA EUBANKS,              Case No. 3:16-cv-00336-MMD-CSD
7                      Petitioner,              ORDER
8       v.
9   RENEE BAKER,[1] et al.,
10                     Respondents.
11

12  **I.    SUMMARY**

13          This matter is before the Court for disposition of the merits of the remaining

14  grounds of Petitioner Charles Shea Eubanks's counseled Third Amended Petition for Writ

15  of Habeas Corpus under 28 U.S.C. § 2254. (ECF No. 43 ("Petition").)[2] In 2013, a Nevada

16  jury convicted Eubanks of first-degree murder with use of a deadly weapon, attempted

17  murder with use of a deadly weapon, and attempted robbery with use of a deadly weapon.

18  (ECF No. 27-1.) He was sentenced, among other things, to life imprisonment without the

19  possibility of parole. (Id.) In his Petition, Eubanks alleges the following: his right to a

20  speedy trial was violated, insufficient evidence supports his convictions, he received a

21  grossly disproportionate sentence compared to his codefendants, he received ineffective

22  assistance of counsel, the State suppressed material impeachment evidence, and

23  cumulative error. For the reasons discussed below, the Court denies the Petition and

24  grants a Certificate of Appealability for Grounds 5(3), 5(7), 5(9), and 6(C)(3).

25

26          [1]The Nevada Department of Corrections' inmate locator page indicates Eubanks
    is incarcerated at High Desert State Prison, where Jeremy Bean is the warden. The Clerk
27  of Court is directed to substitute Jeremy Bean for respondent Renee Baker. See Fed. R.
    Civ. P. 25(d).
28
          [2]The Court dismissed Ground 3 of the Petition as not cognizable. (ECF No. 67.)

## II.    BACKGROUND[3]

### A.    Initial Contact Between Eubanks and Maxwell

On Friday, April 29, 2011, Eubanks met Michael Maxwell, Jr., at the Nugget casino in Pahrump, Nevada; although they had just met that day, they went to Las Vegas together, and upon their return, Maxwell invited Eubanks to stay at his residence. (ECF Nos. 23 at 67, 73, 79-80; 80-1 at 26-27.) Two days later, on Sunday, May 1, 2011, Maxwell requested that Eubanks accompany Troy Jackson to recover a debt from Michael Frasher. (ECF No. 23 at 66.) As Maxwell's "enforcer," Jackson sold drugs, collected tax payments for protection, and beat people. (ECF No. 80 at 80-81.) Tiffany Rubio spent time with Maxwell and Eubanks that weekend and heard that Eubanks might work for Maxwell doing the same thing as Jackson. (ECF No. 80-1 at 36-37.) Maxwell gave two knives to Eubanks and $20 to Eubanks, Jackson, and Jackson's girlfriend, Victoria Garcia, to buy gloves and cigarettes, which they purchased on the way to visit Frasher. (ECF Nos. 23 at 66-67, 69; 80 at 61-62, 101-02, 124.) Maxwell told Jackson to "get [Frasher]" if he had a chance to do so. (ECF No. 80 at 62-63.)

### B.    Stabbing of Frasher and Bell

Jackson learned Frasher was in a camper at Antoinette Bell's residence and Garcia drove them to the camper in Maxwell's white van. (ECF Nos. 79-6 at 133-34; 80 at 53, 58, 94.) Garcia overheard Eubanks tell Jackson he would "do it" if Jackson was unable. (ECF No. 80 at 118.) Garcia saw Eubanks holding knives under his armpits and believed Jackson had a pocketknife. (*Id.* at 98, 105.) Jackson discovered Frasher had no money or drugs. (*Id.* at 59.) Maxwell telephoned while they were with Frasher and told Eubanks "To handle his business and get back home." (ECF Nos. 23 at 69; 80 at 60-61.)

---

[3]The Court summarizes the relevant state-court record solely as background for consideration of the issues in this case. The Court makes no credibility or factual findings regarding the truth or falsity of evidence or statements of fact in the state court. No assertion of fact made in describing statements, testimony, or other evidence in the state court constitutes a finding by this Court. Failure to mention a specific piece of evidence or category of evidence does not signify the Court overlooked it in considering the issues.

1    Eubanks told Jackson and Garcia that Maxwell gave the green light to kill Frasher.

2    (ECF No. 80 at 61, 85, 109-10.) Jackson, Frasher, Bell, and Eubanks, entered Bell's

3    camper, and, according to Jackson, Jackson stabbed Bell while Eubanks killed Frasher.

4    (ECF No. 80 at 55-56, 61, 63.) Jackson said Eubanks "kneeled down beside Mike

5    Frasher's body stabbing him in his cage" and kept stabbing Frasher because Frasher was

6    "flinching." (*Id.*) Jackson said he told Eubanks that Bell would not die, and Eubanks

7    "stepped over Michael Frasher, stabbed [Bell] twice in her stomach," and resumed

8    stabbing Frasher. (*Id.* at 63, 82.) After Bell stopped moving, and Eubanks "had finished

9    off [Frasher]," Jackson and Eubanks left. (*Id.* at 64-65.)

10    Bell ran to a neighbor for help. (ECF Nos. 79-6 at 158; 79-7 at 41.) When the Nye

11    County Sheriff arrived, Bell was asked, "Who did this?" and she replied, "Troy [Jackson]."

12    (ECF No. 79-7 at 41.) The Sheriff found Frasher in the camper bleeding and gasping for

13    air; Frasher later died at the hospital from multiple stabs and incise wounds to his head,

14    neck, and torso. (ECF Nos. 79-6 at 54; 79-7 at 102.) Bell survived a laceration to her

15    throat and 11 stab wounds to her back, chest, abdomen, legs, and arms. (ECF No. 79-6

16    at 82.)

17    **C.    Bell's Conflicting Statements**

18    Nye County Sheriff's Office Detective David Boruchowitz interviewed Bell at the

19    hospital on May 4, 2011. (ECF No. 79-7 at 183-85.) Bell identified Jackson as her attacker

20    and said he had a flip-blade knife. (*Id.*) Bell said Jackson stabbed Frasher. (*Id.*) When

21    asked how Bell knew Jackson stabbed Frasher, Bell replied that Jackson was the only

22    one standing there at the time. (*Id.* at 185-86.) At trial, Boruchowitz opined that Bell's

23    response implied she did not see Jackson stab Frasher. (*Id.*) However, Boruchowitz

24    agreed that Bell unequivocally stated Jackson stabbed her and Frasher. (ECF No. 23 at

25    46.)

26    Nye County Sheriff's Detective Michael Eisenloffel conducted a follow-up interview

27    of Bell at the hospital on May 5, 2011. (*Id.* at 103-05, 109). Bell told Eisenloffel, "They all

28    came in. They stabbed [Frasher] in my camper, two guys. When they stabbed him, they

noticed me looking for my knife, stabbed me 26 times." (*Id.*) Bell twice stated, "I know it was both of them." (*Id.* at 107.) However, Eisenloffel agreed that Bell more than once stated Jackson was the only person with a knife and it was Jackson who stabbed Frasher. (*Id.* at 166-67.) Bell also told Eisenloffel the knife was as big as Jackson's hand, was bloody before Jackson attacked her, and she thought Eubanks just stood there. (*Id.*) Eisenloffel admitted he testified at the preliminary hearing that Bell identified Jackson as the person who stabbed her and Frasher. (*Id.* at 168-69.)

Bell testified at trial that she knew Jackson but never saw Eubanks until the day of the stabbings. (ECF No. 79-6 at 149-50, 159.) Bell said she "got stabbed by Troy Jackson." (*Id.* at 157, 159.) She said "Eubanks was just standing there by the door watching the whole entire time. I'm not sure if he actually had—if he actually got [Frasher]. I don't think he did." (*Id.* at 156.) However, Bell later clarified "he," meant "Jackson." (*Id.*)

On cross-examination, Bell agreed she told a detective that Jackson was the only person who had a knife during the attack, and she saw Jackson repeatedly stab Frasher, then stab her, and then stab Frasher a few more times to ensure he was dead. (ECF No. 79-7 at 39, 45-48.) She told the detective she never saw Eubanks with a knife or with any blood on him. (*Id.*) She said she told the detective she knew Jackson stabbed Frasher because Jackson "was the only one with a knife at that point." (*Id.* at 42-43.) She told the detective Eubanks stood next to Jackson but "he did not have any objects in his hand." (*Id.*) Bell agreed that she consistently testified in other proceedings that it was Jackson who stabbed Frasher. (*Id.* at 45-48.)

On redirect examination, Bell testified her memory was better soon after the event. (*Id.* at 49.) She agreed she was heavily medicated and breathing through a tube during her first interview with the detective at the hospital. (*Id.* at 58.) She said Frasher "was already down" when she looked up and saw Jackson stabbing her. (*Id.* at 53-54.) She saw Jackson stab Frasher as Jackson left the camper. (*Id.* at 57.) She "slightly" recalled previously testifying she did not see who stabbed Frasher. (*Id.*)

///

4

### D.    Eubanks' Statements

Detective Boruchowitz learned Garcia and Jackson were involved in the stabbings and drove a white van that might be located at Maxwell's residence. (ECF No. 79-7 at 169-70, 173.) At Maxwell's residence on the night of the stabbings, Jackson, Eubanks, and Garcia, told Boruchowitz they never left the residence that day and knew nothing about the stabbings. (*Id.* at 174-76.)

After his arrest, Eubanks gave an interview in the presence of his counsel, the prosecutor, and the prosecutor's investigator, in which he confessed he previously gave versions of the facts to distance himself from the incident. (*Id.* at 202.) Eubanks confessed they went to rob Frasher, but Frasher and Bell had nothing for them to steal and Jackson punched Frasher while Eubanks ran away. (ECF Nos. 23 at 38-40; 79-7 at 202-03; 80-1 at 70-71.) Eubanks said that, when they returned to Maxwell's residence, the first thing Maxwell asked was whether they had his money, and Maxwell was "happy with the results and how it went." (ECF Nos. 23 at 38; 79-7 at 203-04.) Eubanks said they burned evidence in the firepit and cleaned the van. (ECF No. 79-7 at 200-01, 204.)

### E.    Witness Statements

Allessandra Vich testified she was Eubanks's girlfriend at the time of the stabbings and that soon after his arrest, she asked Eubanks if he murdered someone; he replied, "yes," and stated he murdered "the guy." (ECF No. 23 at 125, 134-35.) Codefendant Rubio testified that she asked whether Bell and Frasher were "dead," and Eubanks said, "Yes. It was easy," and made a slashing motion across his throat. (ECF No. 80-1 at 37.) Rubio heard Jackson say he could not "finish it," and Eubanks had to finish it. (*Id.* at 38.) Codefendant Maxwell testified Eubanks told him he put a knife through Frasher's head and tried to "finish off" Bell after Jackson told Eubanks that Bell would not die. (ECF No. 23 at 71.) Maxwell testified that, after they were arrested, Eubanks told him, "I thought you wanted me to kill him." (*Id.* at 70.)

Johnny Dowling testified he was acquainted with Frasher. (*Id.* at 50, 54-55.) Dowling, who was himself facing felony charges, testified based on an agreement with

the State. (*Id.* at 57-58, 61-64.) In exchange for "continued truthful testimony" and guilty pleas to two possession charges, he avoided exposure to a life sentence as a habitual criminal, enjoyed dismissal of several cases against him, and was released on his own recognizance. (*Id.*) Dowling claimed that, while he was incarcerated with Eubanks, Eubanks told Dowling he murdered Frasher by burying a knife in his eye or head and that he carried Frasher around by the knife handle while Jackson stabbed Bell. (*Id.* at 50-52.) Dowling told Eubanks about his friendship with Bell, that Bell would appreciate a letter from Eubanks, and that Dowling would deliver a letter to Bell for Eubanks. (*Id.* at 55-57, 62-63.) When Eubanks provided Dowling with a letter addressed to Bell, Dowling instead gave it to law enforcement. (*Id.*) Dowling said he came forward about Eubanks because what happened was "really disturbing" and claimed he would have testified even without a deal. (*Id.* at 58-59.)

Witness Karisma Garcia's[4] existing plea agreement was also amended to provide that, in exchange for truthful testimony, the State would recommend probation and release with a suspended sentence. (ECF Nos. 23 at 201, 206-07; 80 at 44.) Karisma claimed that, while incarcerated with Eubanks, Eubanks confessed during an "open conversation" with other inmates that he stabbed Frasher. (ECF No. 23 at 201-05.) Karisma heard Eubanks state that he was hitchhiking to Las Vegas when Maxwell befriended him, and Eubanks ended up buying gloves, and "in a trailer stabbing somebody." (*Id.*) Karisma testified Eubanks provided a list of witnesses that had been typed by the District Attorney's Office on a charging document, which Karisma delivered to the prosecutor's investigator, and Eubanks "wanted witnesses gone" and "wanted practically the judges gone, D[A]s gone, cops gone," because Eubanks wanted "to beat" the case. (ECF Nos. 80 at 29-32, 39-41, 47; 80-1 at 82-83.) Eubanks told Karisma to get that list out, and that "the right people would get the paperwork once it was out, and it would be taken care of." (ECF No. 80 at 47-48.)

---

[4]Karisma Garcia is referred to as "Karisma" to avoid confusing him with codefendant Victoria Garcia.

Andrew Kaufman, incarcerated in federal prison, was previously incarcerated with Eubanks and testified that Eubanks told him he stabbed Frasher in the head over a drug debt, stabbed Bell, and would have gotten away with it had Jackson done as good a job as Eubanks. (ECF No. 80-1 at 94-96.) In exchange for Kaufman's testimony, the State agreed to tell the United States Attorney about Kaufman's cooperation, and Kaufman hoped it would help his federal case. (*Id.* at 97-98.)

Danny Jarvis testified he met Frasher in 2005 and Frasher once paid rent for Jarvis's girlfriend. (ECF No. 80 at 130, 134.) Jarvis testified that while incarcerated with Eubanks, Eubanks told him he went to collect a debt from Frasher, Frasher did not pay it, and Eubanks stabbed Frasher inside a camper "so hard that the handle broke off the knife." (*Id.* at 132-35.) Jarvis said Eubanks worried his admission to his ex-girlfriend was recorded during a telephone conversation. (*Id.* at 151-52.) Jarvis said Eubanks believed Kaufman might give deposition testimony against him. (*Id.* at 149-50.) Eubanks knew Jarvis could obtain the address of Kaufman's wife, and asked for it, but Jarvis refused. (*Id.* at 150-51.) Jarvis said Eubanks was having his ex-girlfriend "taken care of" and asked if word could be sent to federal prison to "address" Kaufman. (*Id.*)

### F.    Forensic Evidence

At Maxwell's residence following the stabbings, Maxwell devised a plan to "keep [their] mouth[s] shut" and claim they were at his house all day and had a barbecue. (ECF No. 80 at 50-52, 65.) Jackson dug a barbeque pit and he and Eubanks burned gloves, knives, telephones, and clothes in the fire. (*Id.* at 67-69.) Rubio and another individual attempted to sanitize the van. (*Id.* at 70-71.)

When Jackson and Eubanks were arrested in the early morning hours after the stabbings, Detective Eisenloffel observed that neither wore shoes and they had a dark-colored sooty substance on their hands. (ECF No. 23 at 91-95, 103, 151, 160-61.) The front passenger floorboard of Maxwell's van, where Jackson sat on the way to and from stabbing Frasher and Bell, bore Frasher's blood and fragments of cloth or tissue as if used to clean the carpet. (ECF Nos. 79-7 at 15-17, 80-86, 91-92, 96; 80 at 114.)

A fire pit at Maxwell's residence contained (1) a folding-type knife (State's Trial Exhibit 133); (2) two dagger blades (State's Trial Exhibits 10 and 11); (3) apparent burned-out remnants of a cellular telephone; and (4) burned clothing remnants, including shoe eyelets. (ECF Nos. 23 at 17-18; 79-7 at 195-96, 210-11.) Police found an additional knife (State's Trial Exhibit 138) bearing Jackson's DNA in blood on the handle. (ECF No. 79-7 at 22-24.) Maxwell identified State's Trial Exhibits 10 and 11 as blades belonging to the knives he gave to Eubanks. (ECF No. 23 at 67-69.) Jackson identified photographs of the knife blades as depicting those Eubanks used to kill Frasher and said he saw Eubanks throw them into the fire pit. (ECF No. 80 at 70.) Eubanks's DNA was not on the blades, but this was expected as the blades were exposed to fire. (ECF No. 79-7 at 18-22.)

Forensic Pathologist Dr. Lisa Gavin could not definitively state that any of the four knives was the weapon used on Frasher. (*Id.* at 150, 152.) Gavin compared Frasher's wounds with State's Trial Exhibits 10, 11 and 133, and concluded each could have caused some or all of Frasher's injuries. (*Id.* at 143-44.) The fourth knife, State's Exhibit 139, was a pocketknife whose characteristics did not match Frasher's wounds. (*Id.* at 144-47.) Gavin opined it more probable that State's Trial Exhibits 10, 11 and 133 caused Frasher's injuries, and, although it was possible the pocketknife caused incised wounds, including those to the face, it was unlikely it caused stab wounds. (*Id.* at 148-49, 152.)

## III.    GOVERNING LEGAL STANDARDS

Under the Anti-Terrorism and Effective Death Penalty Act (AEDPA), if a state court has adjudicated a habeas corpus claim on its merits, a federal court may only grant habeas relief with respect to that claim if the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established [f]ederal law, as determined by the Supreme Court of the United States"; or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A state court's decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d)(1), "if the state court applies a rule

that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court's decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d)(1) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous . . . [rather] [t]he state court's application of clearly established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409-10, 412) (internal citation omitted). State courts need not be aware of or cite Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75). *See also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult-to-meet" and "highly deferential standard for evaluating state-court rulings which demands that state-court decisions be given the benefit of the doubt") (internal citations omitted). However, deference does not by definition preclude relief. *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). A petitioner has the burden of proof. *See Cullen*, 563 U.S. at 181 (citing *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002)).

///

///

**IV.    DISCUSSION**

**A.    Ground 1—Speedy Trial**

Eubanks alleges his constitutional right to a speedy trial under the Sixth and Fourteenth Amendments was violated because, although he invoked his right at arraignment,[5] his trial was delayed due to the court's schedule and untimely discovery, and the resulting contact with informants prejudiced him. (ECF No. 43 at 14-16.)

**1.    Additional background**

**a.    First trial continuance**

Eubanks was arrested on May 2, 2011. (ECF No. 23 at 41.) In June of 2011, Eubanks unconditionally waived his preliminary hearing in anticipation he would later enter into a guilty plea agreement. (ECF Nos. 17-31 at 2; 79 at 9-11.) On July 11, 2011, Eubanks changed his mind and pleaded not guilty. (ECF No. 18-6 at 3.) Eubanks invoked the 60-day rule for trial, but trial was scheduled for June 5 through 15, 2012, with calendar call on May 7, 2012, on the basis that counsel could not adequately prepare for trial, and there was no court available, within 60 days. (*Id.* at 3-6.)

**b.    Second trial continuance**

In April of 2012, trial counsel filed motions to continue trial and for additional discovery, stating that Eubanks "agrees to a continuance of the trial date." (ECF Nos. 20-11 at 4; 20-12.) The State did not oppose a trial continuance of 90 days or fewer. (ECF No. 20-14 at 2-4.) The State had requested the victims' medical records, but argued that request required no continuance as the records were uncontested. (*Id.*) The State promised to provide the name of a new witness at calendar call on May 7, 2012, and stated the defense had all other discovery in the State's possession. (ECF Nos. 20-14 at 2-4; 20-15 at 3-5; 20-17 at 2-3.)

At calendar call on May 7, 2012, defense counsel argued, "there's absolutely no way we can be prepared," and, without specifying how much time was needed to prepare

---

[5]*See* NRS § 178.556 ("If a defendant whose trial has not been postponed upon the defendant's application is not brought to trial within 60 days after the arraignment on the indictment or information, the district court may dismiss the indictment or information.").

for trial, explained counsel had received 146 audio recordings (approximately 23-25 hours) on April 18, 2012; had not received a report and curriculum vitae for the State's expert pathologist; had been informed on April 25, 2012, about a new jailhouse informant for which the defense lacked information; and had only recently provided the final outcome of the DNA reports. (ECF No. 20-18 at 2-4, 8.) The State took the position that, if continued, trial was preferred in September or October of 2012. (*Id.* at 5-7.) As for discovery, the State argued it was "pretty confident" it could show all 146 audio recordings were provided to the defense as the State received them, the defense was provided with the pathologist's report, the State still had time to notice its expert before trial, and the victims' medical records were not critical because the defense was not expected to challenge the death or injuries. (*Id.*) Trial was rescheduled for October 29, 2012, with calendar call on September 24, 2012. (ECF No. 20-19 at 2.)

### c.    Final trial continuance

At the calendar call on September 24, 2012, Eubanks was present when his counsel verbally requested a trial continuance because (1) the state district court did not respond to an earlier request for investigation fees; (2) the defense was missing discovery concerning an investigation of Jackson for a homicide in Victorville; (3) it was necessary to review Maxwell's sentencing hearing; (4) hiring a forensic expert was under consideration; and (5) counsel had difficulty communicating with Eubanks because counsel had to allot an entire day of travel to visit him. (ECF No. 21-2 at 3-7, 14-15.) The defense request for additional funds and appointment of an investigator to assist with trial preparation was submitted on July 24, 2012, and the state district court's staff informed counsel that the court approved $3,500 in funds; however, counsel did not receive an order from the court and counsel did not follow-up on the request. (ECF Nos. 21-1; 21-2 at 4-6; 21-3.) The State opposed a continuance, arguing that the case was over a year-and-a-half old, the defense should have hired a forensic expert long before and had five to six weeks to obtain an expert opinion and timely notice an expert, and that the Victorville investigation never amounted to anything and was irrelevant, although the

1    State agreed to provide the defense with that information. (ECF No. 21-2 at 6-10, 13.)

2    The state district court noted the trial calendar was "full for the next year," it would need

3    to "bounce and move around a bunch of other trials," and denied the verbal motion to

4    continue trial, but granted the defense's request for additional funds to hire an investigator

5    (ECF No. 21-3), and instructed defense counsel to review the discovery, consult a

6    forensic expert and investigator, and file a motion for trial continuance if additional time

7    was needed. (ECF No. 21-2 at 10-15.)

8        In October 2012, defense counsel filed a motion to continue trial, again stating

9    Eubanks agreed to the continuance. (ECF No. 21-15.) The motion argued a continuance

10   was necessary because defense counsel, the defense investigator, and the defense

11   forensic expert needed more time for trial preparation as they lacked the dimensions of

12   the knives allegedly used as weapons and the cursory information about the knives and

13   photograph of the pocketknife did not resemble any of the knives described in the lab

14   report. (*Id.* at 4-5.) The State opposed a continuance, but requested permission to depose

15   additional informants if trial was continued. (ECF No. 21-14 at 2-3.)

16       On October 29, 2012, the defense motion to continue trial was granted; the

17   defense requested trial in April of 2013, however, the State's schedule did not permit trial

18   until May. (ECF No. 21-19 at 88.) The defense agreed to a new May trial date; although

19   the State preferred May 6, 2013, the defense preferred the following week. (*Id.*) Trial was

20   rescheduled with a primary setting for May 13-17, 2013, and a secondary setting for May

21   6-10, 2013, with calendar call on April 8, 2013. (ECF Nos. 21-19 at 88-91; 21-21 at 2.)

22   Trial commenced on May 13, 2013. (ECF No. 21-46.)

## 2.    Legal principles

24       "The Sixth Amendment guarantees, '[i]n all criminal prosecutions, the accused

25   shall enjoy the right to a speedy . . . trial." *Vermont v. Brillon*, 556 U.S. 81, 89 (2009).

26   When determining whether a defendant's fundamental constitutional right to a speedy

27   trial has been violated, a court balances four factors: (1) whether delay before trial was

28   uncommonly long; (2) whether the government or the defendant is more to blame for that

delay; (3) whether, in due course, the defendant asserted his right to a speedy trial; and (4) whether there is prejudice attributable to the delay. *See Doggett v. United States*, 505 U.S. 647, 651 (1992) (citing *Barker v. Wingo*, 407 U.S. 514, 530 (1972)). The Supreme Court "regard[s] none of the four factors identified above as either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant." *Barker*, 407 U.S. at 533.

The Supreme Court has explained that "[t]he first of these [four factors] is actually a double enquiry" because "[t]o trigger a speedy trial analysis, an accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from 'presumptively prejudicial' delay," as, "by definition" a defendant "cannot complain that the government has denied him a 'speedy' trial" if it has "prosecuted his case with customary promptness." *Doggett*, 505 U.S. at 651-52. *See also Barker*, 407 U.S. at 530 ("Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance."). "Depending on the nature of the charges, the lower courts have generally found postaccusation delay 'presumptively prejudicial' at least as it approaches one year." *Doggett*, 505 U.S. at 652 n.1.

"[D]elays sought by counsel are ordinarily attributable to the defendants they represent." *Vermont*, 556 U.S. at 85. *See also, e.g.*, *McNeely v. Blanas*, 336 F.3d 822, 827 (9th Cir. 2003) (explaining "delay attributable to defendant's own acts or to tactical decisions by defense counsel will not bolster defendant's speedy trial argument"); *United States v. Tanh Huu Lam*, 251 F.3d 852, 857-58 (9th Cir. 2001) (holding a defendant responsible for defense counsel's requests for continuances as defendant never moved to substitute counsel or dismiss indictment before trial, each continuance was granted according to legitimate needs of competent counsel, and the defendant benefitted from counsel's additional preparation of the case). On the other hand, "[a] deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government." *Barker*, 407 U.S. at 531. "A more neutral reason such as negligence or

overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant." *Id*. Negligence is "weighed more lightly than a deliberate intent to harm the accused's defense." *See Doggett*, 505 U.S. at 657.

"Prejudice, of course, should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect," and is "prejudice caused by the delay," "not simply any prejudice that may have occurred before the trial date but unrelated to the fact of the delay itself." *United States v. Gregory*, 322 F.3d 1157, 1163-64 (9th Cir. 2003) (quoting *Barker*, 407 U.S. at 532, 534). The Supreme Court has identified three such interests: (1) "to prevent oppressive pretrial incarceration;" (2) "to minimize anxiety and concern of the accused;" and (3) "to limit the possibility that the defense will be impaired." *Barker*, 407 U.S. at 532. "If witnesses die or disappear during a delay, the prejudice is obvious. There is also prejudice if defense witnesses are unable to recall accurately events of the distant past." *Id*.

### 3.    State Supreme Court's determination

The Nevada Supreme Court concluded the speedy-trial claim lacks merit:

> [E]ubanks argues that his Sixth Amendment right to a speedy trial was violated by a nearly two-year delay in proceeding to trial. It appears that Eubanks only invoked his statutory speedy-trial rights below, NRS § 178.556(1); however, to the extent his request may be construed as invoking his constitutional speedy-trial rights we conclude that his claim lacks merit. We look at a four-part balancing test to determine whether continuances have encroached on a defendant's constitutional right to a speedy trial: (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of the right, and (4) prejudice to the defendant. *Barker*, 407 U.S. at 530. These four factors "must be considered together with such other circumstances as may be relevant." *Id*. at 533. Here, the initial trial date was set for June 5, 2012, 11 months after Eubanks invoked his right, due to the district court's congested calendar.
>
> > [FN 1] Counsel also represented that he could not be prepared to proceed to trial within 60 days.
>
> Subsequently, Eubanks' counsel requested a continuance of trial, to which Eubanks consented, based on counsel's receipt of additional discovery that required additional investigation and counsel's belief that other discovery had not yet been provided to the defense. The district court set trial for October 29, 2012. On October 12, 2012, counsel filed a second motion for a continuance, again with Eubanks' consent, on the ground that additional investigative work and additional discovery was required to adequately prepare for trial. Subsequently, the district court granted a continuance and

the trial began on May 13, 2013. These circumstances militate against concluding that a constitutional violation has occurred. *See Snyder v. Sumner*, 960 F.2d 1448, 1454 (9th Cir. 1992) (concluding that defendant's request for continuance waived his right to speedy trial); *Manley v. State*, 115 Nev. 114, 125-26, 979 P.2d 703, 710 (1999) (concluding that approximately two year delay did not violate defendant's constitutional speedy-trial right because defendant was partially responsible for delay and other reasons for delay were legitimate conflicts with prosecution's and district court's schedule); *Bailey v. State*, 94 Nev. 323, 324, 579 P.2d 1247, 1248 (1978) (concluding that 224-day delay due to congested trial calendar did not violate defendant's constitutional speedy-trial right); *Ingle v. State*, 92 Nev. 104, 105, 546 P.2d 598, 599 (1976) (concluding no constitutional violation of speedy-trial right occurred where record reflected that delays were substantially caused by defendant's actions). Additionally, Eubanks' prejudice argument—that the two-year delay allowed the prosecution to gather evidence against him, "including the testimony of several jailhouse snitches" is unavailing. Accordingly, we conclude that Eubanks has not established a violation of his constitutional speedy-trial right.

(ECF No. 25-26 at 4-6.)

### 4.   Analysis of Ground 1

The speedy trial provision of the Sixth Amendment is engaged by "either a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge." *See United States v. Marion*, 404 U.S. 307, 320 (1971). The Nevada Supreme Court unreasonably applied *Marion* by determining Eubanks's speedy trial right attached when he invoked the right at his arraignment on July 11, 2011. Eubanks's speedy trial right attached at his arrest on May 2, 2011. (ECF No. 23 at 41.) Consequently, the Nevada Supreme Court also unreasonably determined the delay between Eubanks's arrest and the first trial date of June 5, 2012, is 11 months. Under *Marion*, that initial delay was 13 months.

The misapplication of *Marion* and the miscalculation of the initial trial delay did not, however, "result in a decision" that was contrary to, or involved an unreasonable application of, clearly established [f]ederal law, as determined by the Supreme Court, and the decision was not "based on" an unreasonable determination of fact. *See* 28 U.S.C. § 2254(d)(1), (2). *See, e.g.*, *Smith v. Aldridge*, 904 F.3d 874, 880 (10th Cir. 2018) ("[I]t is not sufficient to show the state court's decision merely *included* an unreasonable factual determination."). To the extent it is ambiguous whether *de novo* review of Ground 1 is appropriate, even applying *de novo* review, no relief is warranted. *See Berghuis v.*

*Thompkins*, 560 U.S. 370, 390 (2010) (stating, "[c]ourts can . . . deny writs of habeas corpus under § 2254 by engaging in *de novo* review when it is unclear whether AEDPA deference applies, because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on *de novo* review, *see* § 2254(a).").

The delay of two years and 11 days between Eubanks's arrest on May 2, 2011, and the commencement of his trial on May 13, 2013, triggers a *Barker* analysis. *See Doggett*, 505 U.S. at 652 n.1. *See also, e.g., United States v. Beamon*, 992 F.2d 1009, 1013 (9th Cir. 1993) (finding that 17-month and 20-month "delays are well over one year [presumptively prejudicial delay generally found by courts] and are more than sufficient to trigger the speedy trial inquiry under *Barker*")*. The Court, however, finds that none of the *Barker* factors weigh in favor of finding a speedy-trial violation in Eubanks's case.

For purposes of the first *Barker* factor, the length of the delay was not extraordinary given that (1) the charges against Eubanks included first-degree murder; (2) Eubanks faced a possible sentence of life imprisonment without the possibility of parole; (3) the case was complex and involved multiple codefendants who would testify against Eubanks; (4) defense counsel stated he believed Eubanks might be innocent of the charges given Bell's statements; and (5) the defense was searching for exculpatory forensic evidence. *See Barker*, 407 U.S. at 522 (acknowledging that the speedy-trial right is "consistent with delays and depend[ent] upon circumstances."). *See also, e.g.*, *Doyle v. Law*, 464 F. App'x 601, 604 (9th Cir. 2011) (acknowledging some delay for trial preparation is consistent with the right to speedy trial and holding that considering the seriousness of the murder charges, volume of discovery, and extensive forensic evidence, a 20-month delay did not greatly exceed the threshold to trigger inquiry and did not weigh heavily in favor of a speedy trial violation).

For the second *Barker* factor, the record in Eubanks's case demonstrates the delays were necessary for a variety of reasons, but ultimately attributed to defense counsel's need for trial preparation. The initial 13-month delay between Eubanks's arrest on May 2, 2011, and the initial trial date of June 5, 2012, was due, in part to defense

counsel's inability to prepare for a murder trial within 60 days, and in part due to the state district court's congested trial calendar that did not permit trial within 60 days. Nothing was said about a failure to receive discovery from the State at that point and Eubanks did not request new counsel. The record does not indicate whether defense counsel, the State, or the trial court provided the June 2012 date or whether any of those parties could have proceeded to trial at an earlier date. It is reasonable to conclude the court's congested calendar and defense counsel's need to prepare for trial are each to blame for the initial delay; however, given defense counsel's subsequent motions to continue the trial, it is reasonable to conclude defense counsel would not have been prepared for trial earlier than June 5, 2012. The ultimate responsibility for the initial 13-month continuance thus lay with the defense's need to prepare for trial. *See Barker*, 407 U.S. at 522.

The second trial continuance for four months and 24 days—from June 5, 2012, to October 29, 2012—was occasioned by defense counsel's motion to continue the trial to accommodate trial preparation. Eubanks consented to that request for continuance. Defense counsel's motion alleged the State failed to timely produce discovery that necessitated the continuance, but the State claimed the discovery was produced to defense counsel as the discovery came into the State's possession, and had been, except for a few items that would be produced by the time of the calendar call, produced earlier. Nothing in the record shows the State deliberately attempted to undermine the defense; to the contrary, the prosecutor stated he supported that request for trial continuance and wanted trial counsel to be prepared for trial. Inasmuch as it is unclear whether the State or defense counsel, or both, was negligent or at fault for the delayed review of discovery and consequential trial continuance, neither was more at fault for purposes of balancing the second *Barker* factor. However, given defense counsel's subsequent motions to continue the October 2012 trial, it is reasonable to conclude defense counsel would not have been prepared for trial earlier than the October 29, 2012, trial date. Therefore, the fault for the additional trial delay of four months and 24 days ultimately lies with the defense because of the need to prepare for trial.

The third and final trial continuance for six-and-a-half months was from October 29, 2012, to May 13, 2013. In Eubanks's presence, defense counsel verbally requested a trial continuance to obtain and review one item of outstanding discovery, consult a forensic expert, and because defense counsel had not received a ruling on a request for additional investigator fees. The trial court and defense counsel were equally to blame for a miscommunication concerning the request for investigator fees. The State opposed a continuance stating counsel had sufficient time between the hearing and the October trial date to obtain a forensic expert and review the discovery. The state district court denied the request for a trial continuance and directed defense counsel to file a motion for continuance if additional time was needed after investigation. With Eubanks's consent, defense counsel later filed a motion to continue trial stating counsel needed time to prepare a forensic expert and for further investigation and preparation for trial. The defense, the prosecutor, and the trial court agreed on a continued trial date of May 13, 2013. Considering the continuances were attributed to defense counsel's need to prepare for trial, the second *Barker* factor weighs against a speedy-trial violation.

For purposes of the third *Barker* factor, Eubanks invoked his constitutional speedy trial right at his arraignment in July of 2011. Eubanks thereafter, however, consented to the trial continuances. Thus, the third *Barker* factor weighs against a speedy-trial violation.

Finally, Eubanks claims he was prejudiced because during the trial delay, he was brought into contact with other inmates who testified he confessed to them that he was guilty of the crimes. It was, however, Eubanks's decision to speak with those other inmates, not the delay of the trial itself, that caused him prejudice. *See, e.g., Manley v. State*, 979 P.2d 703, 710 (1999) (holding right to speedy trial not violated as, among other things, appellant caused any prejudice that resulted from the testimony of the "jailhouse snitches" who testified against him by speaking with them during the trial delay).

Eubanks argues that "consideration of prejudice is not limited to the specifically demonstrable." (ECF No. 77 at 14-15 (*citing Doggett*, 505 U.S. at 655).) However, according to the Supreme Court, what is meant by that quoted phrase is that the Supreme

Court has "rejected the notion that an affirmative demonstration of prejudice [is] necessary to prove a denial of the constitutional right to a speedy trial" as none of the four *Barker* factors is a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. *See Moore v. Arizona*, 414 U.S. 25, 26 (1973) (citing *Barker*, 407 U.S. at 533). Instead, the *Barker* factors "are related and must be considered together with such other circumstances as may be relevant." *Barker*, 407 U.S. at 533. "In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process." *Id.*

As explained above, after Eubanks's initial request for trial in 60-days, he never again asserted his speedy trial rights or attempted to remove his counsel for failure to move the case to trial; rather, Eubanks consented to the trial continuances. The length of the delay was not extraordinary under the circumstances, and Eubanks failed to establish discovery was deliberately withheld or delayed. The record shows the delays were, on net, occasioned by the defense's trial preparation. And Eubanks fails to establish a basis to conclude *the delay* itself caused him prejudice. Thus, without requiring that Eubanks establish any specific *Barker* factor, or group of factors, Ground 1 is denied because, on balance, Eubanks fails to establish a violation of his constitutional right to a speedy trial.

### B. Ground 2—Sufficiency of the Evidence

Eubanks alleges the jury verdict was not supported by sufficient evidence because no reasonable juror could have found Eubanks guilty beyond a reasonable doubt in violation of the Sixth and Fourteenth Amendments. (ECF No. 43 at 16-18.) He claims no rational juror could find him guilty beyond a reasonable doubt because Bell testified that Jackson stabbed her and Frasher, the codefendants and jailhouse informants lacked credibility, and forensic evidence did not tie Eubanks to the crimes. (*Id.*)

#### 1. Legal principles

"The jury's finding must stand if, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.'" *Davis v. Woodford*, 384 F.3d

628, 639 (9th Cir. 2004) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (emphasis in original). The *Jackson* standard is applied "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id.* (quoting *Jackson*, 443 U.S. at 324 & n.16). When the deferential standards of AEDPA and *Jackson* are applied together, the question on federal habeas review is whether the state court's decision unreasonably applied the *Jackson* standard to the evidence at trial. *See Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005) (citations omitted) ("After AEDPA, we apply the standards of *Jackson* with an additional layer of deference.").

"[T]he *Jackson* inquiry does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit." *Herrera v. Collins*, 506 U.S. 390, 402 (1993) (emphasis in original). A reviewing court, when "'faced with a record of historical facts that supports conflicting inferences, must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *Davis*, 384 F.3d at 639 (quoting *Jackson*, 443 U.S. at 326). Where circumstantial evidence is used to establish guilt, the Supreme Court has held it is "intrinsically no different from testimonial evidence" because although "circumstantial evidence may in some cases point to a wholly incorrect result" this is "equally true of testimonial evidence." *Holland v. United States*, 348 U.S. 121, 140 (1954) (rejecting contention that circumstantial evidence must exclude every hypothesis but guilt). "In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference," and "[t]he jury must use its experience with people and events in weighing the probabilities." *Id.* "If the jury is convinced beyond a reasonable doubt, [the Supreme Court requires] no more." *Id; see also Jackson*, 443 U.S. at 324-26 (finding circumstantial evidence sufficient to prove specific intent to kill).

In Nevada, "[m]urder is the unlawful killing of a human being . . . [w]ith malice aforethought, either express or implied" and "[m]ay be effected by any of the various

20

means by which death may be occasioned." NRS § 200.010(1). "Murder of the first degree is murder which is perpetrated by means of any kind of willful, deliberate, and premeditated killing." *Byford v. State*, 994 P.2d 700, 714 (2000) (explaining the State must prove all three elements beyond a reasonable doubt to convict of first-degree murder). "Willfulness is the intent to kill." *Id.* "[I]ntent can rarely be proven by direct evidence of a defendant's state of mind, but instead is inferred by the jury from the individualized, external circumstances of the crime, which are capable of proof at trial." *Sharma v. State*, 56 P.3d 868, 874 (2002). "[T]he intention to kill may be ascertained or deduced from the facts and circumstances of the killing, such as the use of a weapon calculated to produce death, the manner of the use, and the attendant circumstances characterizing the act." *Moser v. State*, 544 P.2d 424, 426 (1979). "Deliberation is the process of determining upon a course of action to kill as a result of thought, including weighing the reasons for an against the action and considering the consequences of the action." *Byford*, 994 P.2d at 714. "A deliberate determination may be arrived at in a short period of time." *Id.* "Premeditation is a design, a determination to kill, distinctly formed in the mind by the time of the killing." *Id.* "Attempted murder is the performance of an act or acts which tend, but fail, to kill a human being, when such acts are done with express malice, namely, with the deliberate intention unlawfully to kill." *Valdez v. State*, 196 P.3d 465, 481 (2008) (citations omitted).

Robbery is defined in Nevada as the "[u]nlawful taking of personal property from the person of another, or in the person's presence, against his or her will, by means of force or violence or fear of injury, immediate or future, to his or her person or property . . . or of anyone in his or her company at the time of the robbery," and "[a] taking is by means of force or fear if force or fear is used to . . . [o]btain or retain possession of the property . . . ." NRS § 200.380, *as amended by* Laws 1995, p. 1187. The Nevada Supreme Court has held that NRS § 200.380 defines robbery as a general intent crime. *See Litteral v. State*, 634 P.2d 1226, 1228 (1981). Nevada's criminal code does not provide for a good-faith claim-of-right defense to robbery.

21

NRS § 195.020 provides that a principal to a crime includes a person who directly commits a crime or who aids or abets in its commission:

> Every person concerned in the commission of a felony . . . whether the person directly commits the act constituting the offense, or aids or abets in its commission, and whether present or absent; and every person who, directly or indirectly, counsels, encourages, hires, commands, induces or otherwise procures another to commit a felony. . . is a principal, and shall be proceeded against and punished as such.

"[A]lthough mere presence cannot support an inference that one is a party to an offense, presence together with other circumstances may do so." *Walker v. State*, 944 P.2d 762, 773 (1997) (holding "presence, companionship and conduct before, during and after the crime" are circumstances from which a jury may infer participation in the offense). "[I]n order for a person to be held accountable for the specific intent crime of another under an aiding or abetting theory of principal liability, the aider or abettor must have knowingly aided the other person with the intent that the other person commit the charged crime." *Sharma*, 56 P.3d at 872.

## 2.    State Supreme Court's determinations

The Nevada Supreme Court determined there was sufficient evidence to establish guilt beyond a reasonable doubt:

> [E]ubanks contends that the evidence presented at trial was insufficient to support the jury's finding of guilt. Our review of the record on appeal, however, reveals sufficient evidence to establish guilt beyond a reasonable doubt as determined by a rational trier of fact. *See Origel-Candido v. State*, 114 Nev. 378, 381, 956 P.2d 1378, 1380 (1998); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Specifically, he argues that the evidence is insufficient because the surviving stabbing victim, Antionette Bell, testified that she did not see him stab Michael Frasher, the murder victim, forensic evidence suggested that his codefendant, Troy Jackson, killed Frasher, and that any evidence contradicting those matters was not credible.
>
> The evidence shows that Eubanks and Jackson called on Frasher to collect a drug debt at the behest of Michael Maxwell, Jr. During the visit, Jackson received a call from Maxwell. Jackson handed the cell phone to Eubanks and walked away. After the phone call, Eubanks indicated that he and Jackson had a "green light" to kill Frasher. Immediately thereafter, Jackson began stabbing Bell and Eubanks commenced stabbing Frasher. During the attacks, Jackson told Eubanks that "the bitch won't die," referring to Bell. Eubanks then stabbed Bell several times. Frasher suffered multiple stab wounds to his head, neck, and torso; Bell suffered multiple stab wounds to her head, chest, and abdomen and nearly died. Consistent with

22

her pretrial statements, Bell testified that Jackson was the only one with a knife and that he stabbed Frasher. Bell also testified that she was "a little out of it" during the attacks and she was heavily medicated when she spoke to the police in the hospital. Several inmates with whom Eubanks had been housed after his arrest testified that he admitted to stabbing Frasher to death and provided details about the attacks as related to them by Eubanks. Additionally, Maxwell testified that Eubanks admitted that he "assaulted" Frasher and said to Maxwell, "I thought you wanted me to kill him." Jackson testified that Eubanks stabbed Frasher. Eubanks' girlfriend also testified that, during a brief encounter with him at the courthouse, he admitted that he killed "the guy."

The jury could reasonably infer from the evidence presented that Eubanks was guilty of the charged offenses. *See* NRS 193.165 (deadly weapon enhancement); NRS 193.330 (attempt); NRS 200.030 (murder); NRS 200.380 (robbery). While Bell's testimony contradicted the testimony of other witnesses, the jury was aware of those contradictions, and Eubanks had the opportunity to challenge the credibility and possible bias of the witnesses, including any benefits they received for their testimony and their criminal records. Further, the forensic evidence did not exculpate Eubanks as Frasher's killer. It is for the jury to determine the weight and credibility to give conflicting testimony, and the jury's verdict will not be disturbed on appeal where, as here, substantial evidence supports the verdict. *See Bolden v. State*, 97 Nev. 71, 73, 624 P.2d 20, 20 (1981); *see also McNair v. State*, 108 Nev. 53, 56, 825 P.2d 571, 573 (1992).

(ECF No. 25-26 at 2-4.)

### 3. Analysis of Ground 2

The Nevada Supreme Court's application of *Jackson* and determination that a rational jury could find Eubanks guilty of the offenses beyond a reasonable doubt, either directly, or by aiding and abetting Jackson, is objectively reasonable. During his interview, Eubanks stated they intended to rob Frasher. *See supra*, p. 5. Jackson testified they went to Frasher's residence to collect a debt owed to Maxwell. *See supra*, pp. 2-3. Jackson and Garcia testified they purchased gloves on the way to see Frasher and that Jackson and Eubanks had knives. *Id.* Jackson and Garcia each testified that, after they arrived and learned that Frasher had no money or drugs, Eubanks told them Maxwell gave them the green light to kill Frasher. *Id.* Jackson testified he stabbed Bell and Eubanks stabbed Frasher, and when Jackson informed Eubanks Bell would not die, Eubanks stabbed Bell. *Id.* Rubio testified Eubanks confirmed his belief that Frasher and Bell were dead and told Rubio it was "easy" while making a slashing motion across his neck. *See supra*, p. 5. Eubanks's ex-girlfriend and four jailhouse informants testified that Eubanks stated he killed Frasher, and informant Kaufman testified that Eubanks said he stabbed Bell. *See*

*supra*, pp. 5-7. Maxwell testified Eubanks told him he thought Maxwell wanted him to kill Frasher. *Id.* While Bell's testimony, the forensic evidence, and the motivations of the codefendants and jailhouse informants presented conflicting inferences, it is presumed, for purposes of determining whether the State presented sufficient evidence for any rational jury to convict Eubanks, that the jury resolved those conflicts in favor of the prosecution. *See Jackson*, 443 U.S. at 326. For the foregoing reasons, Ground 2 is denied.

### C.   Ground 4—Disproportionate Sentence

Eubanks alleges the trial court erred by sentencing him to maximum consecutive prison terms in violation of the Sixth, Eighth, and Fourteenth Amendments as his codefendants received grossly disproportionate lower sentences. (ECF No. 43 at 20-22.)

#### 1.   Legal principles

The Eighth Amendment forbids sentences that are "grossly disproportionate" to the crime. *See Graham v. Fla.*, 560 U.S. 48, 59-60 (2010). In non-capital cases, a court first compares the gravity of the offense with the severity of the sentence to determine whether it is a "rare" case leading to an inference of gross disproportionality. *See id.* (citing *Harmelin v. Michigan*, 501 U.S. 957, 1005 (1991) (opinion of Kennedy, J.)). *See also Solem v. Helm*, 463 U.S. 277, 289-92 (1983) (explaining a court weighs the criminal offense and penalty "in light of the harm caused or threatened to the victim or society, and the culpability of the offender" and agreeing that "'[o]utside the context of capital punishment, successful challenges to the proportionality of particular sentences [will be] exceedingly rare . . .'".) (internal citation omitted); *Norris v. Morgan*, 622 F.3d 1276, 1290 (9th Cir. 2010) (stating, "[w]e compare the harshness of the penalty imposed upon the defendant with the gravity of his triggering offense and criminal history"). Second, "'[i]n the rare case in which . . . [the] threshold comparison . . . leads to an inference of gross disproportionality' the court should then compare the defendant's sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions." *Graham*, 560 U.S. at 60 (quoting

*Harmelin*, 501 U.S. at 1005 (opinion of Kennedy, J.)). "If this comparative analysis 'validate[s] an initial judgment that [the] sentence is grossly disproportionate,' the sentence is cruel and unusual." *Id.* For noncapital cases, "[r]eviewing courts . . . should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes, as well as to the discretion that trial courts possess in sentencing convicted criminals." *Solem*, 463 U.S. at 290; *see also United States v. Parker*, 241 F.3d 1114, 1117 (9th Cir. 2001) (observing sentence not exceeding statutory limits will not usually be overturned under Eighth Amendment).

### 2.    Background

The jury sentenced Eubanks to life imprisonment without the possibility of parole for first-degree murder. (ECF Nos. 24-3 at 7, 14; 27-1 at 2-3; 80-3 at 110-11.) The state district court imposed, in addition and consecutive to the sentence of life imprisonment without the possibility of parole for the first-degree murder conviction: (1) eight to 20 years for the use of a deadly weapon in the commission of first-degree murder; (2) eight to 20 years for attempted murder with use of a deadly weapon plus four to 10 years for the use of a deadly weapon; and (3) four to 10 years for attempted robbery plus four to 10 years for use of a deadly weapon. (ECF No. 27-1 at 3-4.)

Codefendant Jackson pleaded guilty to conspiracy to commit murder with the use of a deadly weapon against Frasher and the attempted murder with the use of a deadly weapon against Bell. (ECF No. 19-11 at 2-3.) His plea agreement was not contingent upon his testifying at trial. (ECF Nos. 19-11 at 2-5; 80 at 67.) Jackson testified he was sentenced to imprisonment for 18 to 60 years. (ECF No. 80 at 52.)

Maxwell pleaded guilty to four felonies: solicitation to commit murder with use of a deadly weapon, attempted theft, unlawful use of a controlled substance, and theft of electricity. (ECF No. 20-4 at 2-3.) The State agreed to forego the charges for murder and attempted murder, that the agreement constituted a "global resolution" of all charges pending in the Nye County District Attorney's Office, and the State would recommend concurrent sentences. (*Id.*) The agreement provided that, if Maxwell agreed to testify

truthfully to his phone conversation with a co-defendant just before Frasher was killed and Bell was attacked, and if Maxwell's wife (Amber Maxwell) pleaded guilty to pending charges against her, the State would recommend release of Maxwell's wife on her own recognizance and a probationary sentence for any felony offenses for which his wife pleaded guilty. (*Id.* at 3-4.) Maxwell testified he avoided a life sentence and was sentenced to imprisonment for 15 to 45 years. (ECF No. 23 at 73, 76.)

Garcia pleaded guilty to attempted murder and agreed to truthfully testify at trial. (ECF No. 20-5 at 2-3.) The State promised to forego the remaining charges and recommend release on her own recognizance and a probationary sentence. (*Id.*) She testified she was sentenced to six to 15 years imprisonment. (ECF No. 80 at 121.)

Rubio was convicted of two felonies: accessory to murder with the use of a deadly weapon and/or attempt murder with use of a deadly weapon and/or robbery with use of a deadly weapon and unlawful use of a controlled substance. (ECF No. 84-1 at 11.) Her sentences were suspended, and she was placed on probation not to exceed five years, but probation was revoked, and her sentence of 36 to 120 months was reinstated. (*Id.*)

A Presentence Investigation Report ("PSI") recommended Eubanks be sentenced to imprisonment for life without the possibility of parole for the first-degree murder conviction and lesser consecutive sentences for the remaining convictions. (*Id.* at 13.) Eubanks was 24 years old; he had never been to prison, serving only jail time, and his probation was revoked for a possession of stolen vehicle gross misdemeanor conviction. (*Id.* at 4-6.) Eubanks had no prior felony convictions, two gross misdemeanor convictions (for attempted possession of a stolen vehicle and aiming a firearm at a human being), and four misdemeanor convictions (for carrying a concealed weapon, battery, possession of drug not to be introduced into interstate commerce, and malicious destruction of private property). (*Id.*) Eubanks had outstanding warrants for misdemeanors, and was arrested or cited for felony, gross misdemeanor, and misdemeanor offenses for which disposition was unknown, unavailable, or dismissed. (*Id.* at 6-7.) Although Eubanks denied gang membership, according to a prior probation violation report dated November 19, 2009,

Eubanks was a self-admitted member of the "Donna Street Crips" criminal street gang. (*Id.*)

At Eubanks's penalty phase, Detective Boruchowitz testified Eubanks was previously arrested 10 times as a juvenile, starting when he was 11 years old, for theft, obstructing a peace officer, firearms offenses, firearms offenses on a school, and larceny of automobile type offenses. (ECF No. 80-3 at 16-17.) Boruchowitz testified that, as an adult, Eubanks was arrested for burglary, larceny, assault with a deadly weapon, a couple of drug offenses, including possessing marijuana with intent to sell, a firearms offense, and repeats of the offenses. (*Id.*) Boruchowitz further testified that Eubanks's two gross misdemeanor convictions for a stolen vehicle and for aiming a firearm at a human being were reduced from a charge of assault with a deadly weapon. (*Id.* at 17-18.) Boruchowitz said that, just before the crimes in this case, Eubanks was arrested in Clark County for carrying a concealed weapon and lewd conduct and taken to Nye County on a traffic warrant. (*Id.* at 18-19.) His probation was revoked as a juvenile and adult. (*Id.* at 19-20.)

### 3.    State Supreme Court's determination

The Nevada Supreme Court concluded the codefendants' sentences are irrelevant, and even if relevant, that codefendants' circumstances differed from those of Eubanks:

> [E]ubanks argues that the district court erred by sentencing [him] to maximum consecutive prison terms because his codefendants received lesser terms and his sentence is grossly disproportionate to the crimes he committed in violation of the Eighth Amendment.
>
> [FN 3] Eubanks was sentenced as follows: life imprisonment without the possibility of parole plus a consecutive term of 96 to 240 months for murder with the use of a deadly weapon; 96 to 240 months imprisonment plus an equal and consecutive term for attempted murder with the use of a deadly weapon; and 72 [sic] to 180 [sic] months plus an equal and consecutive term for attempted robbery with the use of a deadly weapon.
>
> His arguments lack merit for several reasons. First, "sentencing is an individualized process; therefore, no rule of law requires a court to sentence codefendants to identical terms," *Nobles v. Warden*, 106 Nev. 67, 68, 787 P.2d 390, 391 (1990); *Martinez v. State*, 114 Nev. 735, 738, 961 P.2d 143, 145 (1998) (observing that district court has discretion to consider "wide, largely unlimited variety of information to insure that the punishment fits not only the crime, but also the individual defendant"), and "[t]he Eighth Amendment requires that defendants be sentenced individually, taking into

account the individual, as well as the charged crime," *Martinez*, 114 Nev. at 737, 961 P.2d at 145. Consequently, the sentences of others involved in the crimes were irrelevant here. Second, even if those matters were relevant, his codefendants pleaded guilty to offenses less than murder and their complete criminal histories, as well as any mitigation, are unknown. Third, Eubanks had incurred an extensive juvenile and adult criminal history by the time he was 22 years old (his age at the time of the crimes). His sentence is not surprising considering the viciousness of the attacks and his criminal history. We discern no abuse of discretion by the district court or Eighth Amendment violation regarding sentencing.

(ECF No. 25-26 at 8-9.)

### 4. Analysis of Ground 4

While it was clearly established at the time of Eubanks's sentencing that the Eighth Amendment protects against a punishment grossly disproportionate to the crime, *see Solem*, 463 U.S. at 284, Eubanks cites no clearly established federal law, as determined by the Supreme Court, that holds a comparison of the sentences of codefendants is required for purposes of analyzing proportionality under the Eighth Amendment. To the extent Eubanks alleges his sentence is unconstitutionally disproportionate to the crimes of which he was convicted, the state supreme court's rejection of this claim is neither contrary to nor constitutes an unreasonable application of clearly established federal law as determined by the Supreme Court and is not based on an unreasonable determination of the facts considering the evidence presented in the state court proceedings.

First, the jury and the state district court sentenced Eubanks within statutory limits for his offenses. The sentence of imprisonment for life without the possibility of parole for first-degree murder was permitted under NRS § 200.030(4)(b)(1), *as enacted by* Laws, 2007 c. 35, § 1. Imprisonment for eight to 20 years was lawful for attempted murder as, by statute, it was punishable by imprisonment for not less than two years and a maximum term of not more than 20 years. *See* NRS § 200.030(4), *as enacted by* Laws, 2007 c. 35, § 1; NRS § 193.330(1)(a)(1), *as enacted by* Laws 1997, p. 1178. The sentence of four to 10 years for attempted robbery was within the proscribed minimum term of not less than one year and maximum term of not more than 10 years. *See* NRS § 193.330(a)(2) *as enacted by* Laws 1997, p. 1178; NRS § 200.380(2), *as enacted by* Laws 1985, p. 1187. The consecutive sentences to account for use of a deadly weapon were also within

statutory limits: eight to 20 years for first-degree murder and four to 10 years each for attempted murder and attempted robbery. *See* NRS § 193.165(1) and (2)(b).

Second, the gravity of the offenses compared to the severity of the sentences, taking into consideration the harm caused or threatened to the victim or society, and Eubanks's culpability and lengthy criminal history, do not render this a "rare" instance leading to an inference of gross disproportionality. Before sentencing Eubanks, the jury and the sentencing court received evidence of (1) Eubanks's prior criminal history, including juvenile criminal history that began at a very young age; (2) his involvement with a street gang; (3) his changing stories about his participation in the crimes against Frasher and Bell; (4) evidence suggesting Eubanks may have participated in the killing of Frasher for hire; (5) evidence Frasher and Bell were lured into the camper and trapped in that confined space without means of escape; (6) the brutality of the stabbings including the number of knives used, the number of incise and stab wounds, and locations of the wounds; (7) the destruction of evidence; (8) Eubanks's callous remarks concerning his stabbing of Frasher; and (9) Eubanks's confessions to his former girlfriend, and others, that he killed Frasher. The record demonstrates that before sentencing Eubanks, the court and the jury were provided with evidence concerning the unique roles and direct and indirect participation of each of the codefendants, whether the codefendants expressed remorse for their participation, the codefendants' admitted their crimes and entered into plea agreements with conditions of their cooperation with the State, and evidence of the corresponding motivations of the codefendants, their convictions, and sentences.

The Nevada Supreme Court's determination the sentence does not violate the Eighth Amendment and, even assuming the codefendants' sentences are relevant, Eubanks's sentence was not disproportionate under the Eighth Amendment, is objectively reasonable under these circumstances. Accordingly, Ground 4 is denied.

///

///

**D.    Grounds 5(1-7)—Exhausted IAC Claims**

Ground 5 includes allegations that Eubanks was deprived the right to the effective assistance of trial and appellate counsel ("IAC") in violation of the Fifth, Sixth, and Fourteenth Amendments. (ECF No. 43 at 22-55.) The Court previously determined Grounds 5(8)-(15) are procedurally defaulted and deferred ruling on those claims until review on the merits of the Petition. (ECF No. 67 at 5-6.)

**1.    Standards for evaluating ineffective assistance of counsel**

"[T]he Sixth Amendment does not guarantee the right to perfect counsel; it promises only the right to effective assistance . . .." *Burt v. Titlow*, 571 U.S. 12, 24 (2013). An IAC claim requires a petitioner demonstrate (1) the attorney's "representation fell below an objective standard of reasonableness[;]" and (2) the attorney's deficient performance prejudiced the petitioner such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984). "Unless a [petitioner] makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "The likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112; *Cullen*, 563 U.S. at 189. IAC claims are examined separately to determine whether counsel was deficient, but "prejudice may result from the cumulative impact of multiple deficiencies." *Boyde v. Brown*, 404 F.3d 1159, 1176 (9th Cir. 2005) (quoting *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978)). A petitioner must show "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" and "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687-88.

A petitioner who makes an IAC claim "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."

*Strickland*, 466 U.S. at 690. When considering an IAC claim, a court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689. In considering IAC claims, a court is obliged to "determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 690. "In making that determination, the court should keep in mind that counsel's function as elaborated in prevailing professional norms, is to make the adversarial testing process work," but that "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

"A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the [reasonableness of counsel's] conduct from counsel's perspective at the time." *Id.* at 689. Strategic choices made "after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]" *Id.* at 690. However, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690-91.

"Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult" because "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential,'" and when applied in tandem, "review is 'doubly so.'" *Harrington*, 562 U.S. at 105 (internal citations omitted); *see also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) ("When a federal court reviews a state court's *Strickland* determination under AEDPA, both AEDPA and *Strickland's* deferential standards apply; hence, the Supreme Court's description of the standard as 'doubly deferential.'") (citing *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003)).

///

## 2. Ground 5(1)—Investigate competency

Eubanks alleges trial counsel was ineffective in failing to investigate Eubanks's competency based on his drug abuse, mental health, and medical history. (ECF No. 43 at 22-25.) He alleges his counsel's ineffective assistance deprived him (1) an opportunity to assert incompetence as a defense against the elements of specific intent and malice aforethought for first- and second-degree murder; (2) the ability to assist in the preparation and defense of the case; (3) an opportunity to make an informed decision regarding plea offers; and (4) a trial that was not structurally defective because he was incompetent and illiterate. (*Id.*)

Respondents argue that the psychosocial evaluation and sentencing hearing transcript do not contain information undermining Eubanks's ability to formulate the *mens rea* for first-and second-degree murder. (ECF No. 72 at 35-36.) They further argue that even if trial counsel possessed that information pretrial, a reasonable attorney could determine a competency evaluation was unnecessary, based on interactions with Eubanks. (*Id.*)

A defendant is competent for purposes of trial if he has "'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and has 'a rational as well as factual understanding of the proceedings against him.'" *Godinez v. Moran*, 509 U.S. 389, 396 (1993) (quoting *Dusky v. United States*, 362 U.S. 402 (1960)). *See also Drope v. Missouri*, 420 U.S. 162, 171 (1975) ("[A] person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial.").

"Trial counsel has a duty to investigate a defendant's mental state if there is evidence to suggest the defendant is impaired." *Douglas v. Woodford*, 316 F.3d 1079, 1085 (9th Cir. 2003). A hearing to determine a defendant's competency is constitutionally and statutorily required where a reasonable doubt exists on the issue. *See Moore v. United States*, 464 F.2d 663, 666 (9th Cir. 1972); *see also* NRS § 178.400-178.440;

*Warden v. Conner,* 562 P.2d 483, 484 (1977).

In Nevada, "[a] person may not be tried or adjudged to punishment for a public offense while incompetent." NRS § 178.400(1). "Incompetent" means a person does not have the present ability to: "(a) [u]nderstand the nature of the criminal charges against the person; (b) [u]nderstand the nature and purpose of the court proceedings; or (c) [a]id and assist the person's counsel in the defense at any time during the proceedings with a reasonable degree of rational understanding." *Id.* If a doubt arises as to the competence of a defendant, the court shall suspend the proceedings, the trial, or the pronouncing of the judgment until the question of competency is determined. *See* NRS § 178.405(1).

The Nevada Supreme Court determined Eubanks did not demonstrate trial counsel's failure to investigate competency was deficient or prejudicial under *Strickland*:

> Eubanks claimed that trial and appellate counsel were ineffective, accordingly, he bore the burden of demonstrating that (1) counsel's performance fell below an objective standard of reasonableness and (2) prejudice. *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984); *Kirksey v. State*, 112 Nev. 980, 987-88, 998, 923 P.2d 1102, 1107, 1114 (1996). To prove ineffective assistance of appellate counsel, a petitioner must demonstrate that counsel's performance was deficient and resulting prejudice such that the omitted issue would have had a reasonable probability of success on appeal. *Kirksey*, 112 Nev. at 998, 923 P.2d at 1114. A court need not consider both prongs of the *Strickland* test if a defendant makes an insufficient showing on either prong. *Strickland*, 466 U.S. at 697. An evidentiary hearing is warranted only if a petitioner raises claims supported by specific factual allegations that are not belied by the record and, if true, would entitle him to relief. *See Hargrove v. State*, 100 Nev. 498, 502, 686 P.2d 222, 225 (1984).
>
> [E]ubanks claimed that trial counsel was ineffective for failing to investigate his competency before trial. He asserts that he was not competent to assist counsel in his defense, make an informed decision regarding whether to accept a guilty plea or proceed to trial, or form the specific intent for first-degree murder. Eubanks failed to demonstrate that trial counsels' performance was deficient or that he was prejudiced. Eubanks' history of drug abuse, possible PTSD, and mental health history, without more, did not indicate that he was unable to consult with his attorney or understand the proceedings against him. *See Melchor-Gloria v. State*, 99 Nev. 174, 179-80, 660 P.2d 109, 113 (1983) (citing *Dusky v. United States*, 362 U.S. 402 (1960)). Notably, the record reveals multiple interactions between Eubanks and the district court that did not cast doubt on his competency. Eubanks even acknowledged in his petition that he communicated with counsel. As Eubanks failed to demonstrate sufficient circumstances raising doubt as to his competency, he did not demonstrate that counsel's alleged failure to investigate his competency was unreasonable. Therefore, the district court did not err in denying this claim.

1    (ECF No. 27-15 at 2-3.)

2              Ground 5(1) is denied. The Nevada Supreme Court was reasonable in its

3    application of *Strickland's* performance prong and determination that trial counsel's failure

4    to investigate and pursue incompetency to stand trial was not deficient. Eubanks did not

5    establish counsel was presented with facts that would cause a reasonable trial attorney

6    to doubt Eubanks's ability to consult with counsel with a reasonable degree of rational

7    understanding or to doubt that Eubanks had a rational, as well as factual, understanding

8    of the proceedings against him. The record is to the contrary. Eubanks gave five

9    interviews, including one where his counsel and the prosecutor were present. (ECF No.

10   79-7 at 197.) Eubanks was canvassed by the state justice court. (ECF No. 79 at 9-11.) At

11   arraignment, through his counsel, Eubanks asserted his right under state law to be tried

12   within 60 days. (ECF No. 18-6 at 3.) For the penalty phase, the defense forensic

13   psychologist and mitigation specialist stated no concerns about Eubanks's competency

14   after having interviewed Eubanks for 4.5 hours, conducting collateral interviews of family

15   members and a close friend, reviewing records and interviews, and conducting relevant

16   psychosocial and neuropsychological research. (ECF No. 24-7.) Eubanks alleges he is

17   illiterate; however, an individual can be illiterate, i.e., have an inability to read and write,

18   yet have a rational as well as factual understanding of the legal proceedings against him

19   and the ability to consult with his lawyer.

20              To the extent Eubanks alleges counsel failed to investigate competency to pursue

21   a defense to the specific intent required for the murder and attempted murder offenses,

22   the state supreme court's determination is objectively reasonable. A finding of

23   incompetency is not a defense to a crime. Insofar as Eubanks equates incompetency with

24   insanity, his claim is misguided. For insanity to act as a complete defense to the charged

25   crimes, Eubanks must satisfy the *M'Naghten* test—that is, "[d]ue to a disease or defect of

26   the mind," he suffered delusions such that he did not "(1) [k]now or understand the nature

27   and capacity of his . . . act; or (2) [a]ppreciate that his or her conduct was wrong." NRS §

28   174.035(6)(b); *Finger v. State,* 27 P.3d 66, 72-73, 84-85 (2001). Eubanks fails to specify

34

delusions, or that he informed counsel he suffered from delusions, during the offenses. Mental health problems do not meet the *M'Naghten* test for insanity. *See Finger*, 27 P.3d at 72. The state supreme court was reasonable in determining that counsel's failure to investigate competency for the purpose of challenging the requisite mental state for the crimes charges was not deficient or prejudicial under *Strickland*.

### 3.    Ground 5(2)—Reinstate Preliminary Hearing

Eubanks alleges trial counsel was ineffective in failing to move to reinstate the preliminary hearing. (ECF No. 43 at 25-29.) He alleges that, but for counsel's failure to file a motion reinstating the preliminary hearing, he could have explained to the state court that the State duped him into waiving preliminary hearing by later changing the terms of the plea offer. (*Id.*) Respondents argue Eubanks unconditionally waived the preliminary hearing, and he could not later reinstate it. (ECF No. 72 at 36.) They argue the record fails to indicate the State placed a new condition on the plea agreement after Eubanks waived his preliminary hearing. (*Id.*)

On May 2, 2011, Eubanks told Detective Boruchowitz that he didn't want the codefendants to know he was snitching on them and wanted assurance that whatever Eubanks relayed to him would not be shared with them. (ECF No. 79-7 at 182.) Detective Eisenloffel testified that, shortly after arrest, Eubanks wanted to cooperate with the Sheriff's Office and testify against the codefendants. (ECF No. 23 at 112-14.)

On June 3, 2011, a preliminary hearing for all defendants was held in state justice court. (ECF No. 79 at 2-3.) Before testimony was presented, Eubanks signed an unconditional waiver of preliminary hearing in anticipation of entering a guilty plea to one count of robbery with use of a deadly weapon in the state district court. (ECF Nos. 17-31 at 2-3; 79 at 9-11.) The state justice court advised Eubanks that if he waived his preliminary hearing and later changed his mind about his negotiation, he would proceed to trial in the state district court, and, confirmed Eubanks understood this and was of "sound mind" to know what he was doing:

THE COURT: [M]r. Eubanks, do you understand by waiving your preliminary hearing today that you are giving up your right to have a preliminary hearing?

THE DEFENDANT: Yes, your Honor.

THE COURT: Do you understand that once you get to District Court, if these negotiations as [defense counsel] has stated do not go through at the District Court level, or if you change your mind once you get there, you would proceed directly on to trial at the District Court level rather than returning to this court?

THE DEFENDANT: Yes, your Honor.

THE COURT: Is your waiver voluntary?

THE DEFENDANT: Yes, your Honor.

THE COURT: And do you believe you're of sound mind to know what you're doing today?

THE DEFENDANT: Yes, your Honor.

. . . .

[DEFENSE COUNSEL]: [I] have the waiver, if I may approach.

THE COURT: All right. Thank you. The bailiff will take that from you.

I find the defendant, Charles Shea Eubanks, has voluntarily and knowingly waived preliminary hearing in this matter, and order that he be bound over to the Fifth Judicial District Court to answer to the charges . . ..

(ECF No. 17-32 at 9-11.)

On July 11, 2011, Eubanks appeared in the state district court for arraignment. (ECF No. 18-6 at 2-3.) Trial counsel informed the state district court that Eubanks changed his mind and wished to plead not guilty and move forward with a trial. (*Id.*) The state district court canvassed Eubanks, and counsel explained the negotiated plea was very favorable because, instead of the possibility of a sentence of life imprisonment, Eubanks would have faced a sentence recommendation of two to 15 years for robbery plus a consecutive sentence of two to five years for the use of a deadly weapon:

THE COURT: Mr. Eubanks, you had the opportunity to talk with your attorney regarding the charges in this matter. And they made a negotiation offer to you, and he told you what that was and that if you were convicted of that negotiated offer and you got sentenced by me, about how much time you would be looking at, and so forth.

Alternatively, he told you about the original charges, what kind of time you would be looking at if you were convicted of those, your witnesses, your defense. He talked with you about the totality of the circumstances, and based on everything that you've heard, you want to enter a not guilty plea today, correct?

THE DEFENDANT: Yes, sir.

THE COURT: Very good.

[DEFENSE COUNSEL]: And if I may, Your Honor, I would like to put a little more on the record.

THE COURT: Thank you.

[DEFENSE COUNSEL]: This case, originally the charges were Murder with Use of a Deadly Weapon, Attempt Murder With Use of a Deadly Weapon. The Murder charge alone was a—he faces a possibility of life imprisonment. The negotiations were Robbery with Use of a Deadly Weapon, with a sentence recommendation of two to 15, and a consecutive sentence recommendation of two to five on the Deadly Weapon Enhancement. Those negotiations, I believe, were very favorable; and his rejection is unfavorable to him.

(*Id.* at 4-6.)

The Nevada Supreme Court determined failure to reinstate the preliminary hearing was not deficient as Eubanks unconditionally waived his preliminary hearing, and was advised he could not withdraw his waiver if the plea negotiations proved unacceptable:

> [E]ubanks claimed that trial counsel was ineffective for failing to reinstate the preliminary hearing after the State altered the terms of the plea agreement. Eubanks failed to demonstrate that counsel's performance in this respect was unreasonable where Eubanks waived his right to a preliminary hearing after he was personally advised by the court that his waiver was unconditional and could not be withdrawn if the plea negotiations, which had not been completed, failed to result in an acceptable bargain. Therefore, the district court did not err in denying this claim.

(ECF No. 27-15 at 3-4.)

Under Nevada law, the state district court could, for good cause, remand for a preliminary examination provided it had not been unconditionally waived:

> If a preliminary examination has not been had and the defendant has not unconditionally waived the examination, the district court may for good cause shown at any time before a plea has been entered or an indictment found remand the defendant for preliminary examination to the appropriate justice of the peace or other magistrate, and the justice or other magistrate shall then proceed with the preliminary examination as provided in this chapter.

NRS § 171.208. Good cause exists where a preliminary examination is waived *as a condition* of an aborted plea bargain. *See Fleming v. Sheriff, Clark Cnty.*, 596 P.2d 243, 245 (1979) (citing *Cf. Santobello v. New York*, 404 U.S. 257 (1971) (emphasis added)).

The Nevada Supreme Court's application of *Strickland's* performance prong is objectively reasonable. Although Eubanks may have misunderstood the level of

1  cooperation the State would later expect him to perform as part of the contemplated plea

2  agreement, nothing in the record indicates the waiver of the preliminary examination was

3  a condition of a plea agreement. Instead, the record shows Eubanks was willing to

4  cooperate and testify against his codefendants, entered an unconditional waiver of his

5  preliminary hearing, and was advised he could not return to state justice court if his plea

6  negotiations did not go as planned or if he changed his mind. Under the circumstances,

7  an objectively reasonable attorney could determine there was no good cause supporting

8  a motion to reinstate the preliminary hearing. Ground 5(2) is denied.

9          **4.      Ground 5(3)—Explanation of aiding and abetting a murder.**

10         Eubanks alleges trial counsel was ineffective for failing to adequately explain

11  Eubanks could be convicted of murder under an aiding and abetting theory based on his

12  mere presence at the scene of the crimes. (ECF No. 43 at 29-32.) He alleges he did not

13  understand the aider and abettor charges as he is illiterate, and counsel led him to believe

14  he could be acquitted because Bell did not see Eubanks stab Frasher. (*Id.*) He claims

15  that, had he been adequately advised, he would have accepted a plea offer and entered

16  an *Alford* plea rather than go to trial.[6]

17         Respondents argue Eubanks failed to demonstrate trial counsel was ineffective in

18  failing to explain the elements of murder and aiding and abetting liability. (ECF No. 72 at

19  37.) They contend the record shows Eubanks acknowledged he was familiar with the

20  charges and discussed them with counsel. (*Id.*) They argue trial counsel had no obligation

21  to tell Eubanks his presence at the crime scene was sufficient to convict him because that

22  would misstate Nevada law. (*Id.*) (citing *Brooks v. State*, 747 P.2d 893, 894-95 (1987)).

23  They further argue Eubanks was not prejudiced because, having rejected a plea to

24  robbery, Eubanks was unlikely to accept a different plea offer. (*Id.* at 38.)

25

26         [6]Eubanks cites "*Alford v. State*" but gives no citation for that case, and
    Respondents did not refer to it in their Answer. (ECF Nos. 43 at 42; 72; 77 at 29.) The
27  Court concludes, based on the context, that Eubanks refers to *North Carolina v. Alford*,
    400 U.S. 25, 37 (1970) ("An individual accused of crime may voluntarily, knowingly, and
28  understandingly consent to the imposition of a prison sentence even if he is unwilling or
    unable to admit his participation in the acts constituting the crime.").

To establish *Strickland* prejudice in the context of pleas, a petitioner must demonstrate that but for the ineffective advice of counsel "there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), and that the court would have accepted its terms . . . ." *Lafler v. Cooper*, 566 U.S. 156, 164 (2012). In addition, a defendant must show "that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." *Id.*

In opening remarks, trial counsel argued the evidence would show Eubanks told police "I saw what happened. I was there," but "just being present at the scene of a crime does not make you an aider and abettor or an accomplice to a crime." (ECF No. 79-6 at 35.) Jailhouse informant Kaufman testified Eubanks was "adamant" about taking his case "to the box meaning to trial" to let the jury decide his case. (ECF No. 80-1 at 98.)

After the presentation of evidence, the trial court instructed the jury that, as to murder and attempted murder, it was alleged that Eubanks was liable under two theories: either by directly committing the acts or aiding and abetting Jackson in committing the crimes. (ECF No. 80-2 at 37-40, 54-55.) The trial court also instructed the jury that "mere presence at the scene of a crime or knowledge that a crime is being committed is not sufficient to establish that a defendant is guilty of an offense, unless you find beyond a reasonable doubt that the defendant was a participant and not merely a knowing spectator." (*Id.* at 56.)

In closing remarks, defense counsel argued Eubanks's "mere presence at the murder scene does not make him guilty of the crime committed by" Jackson, that Eubanks did not participate in a plan to murder Bell and Frasher because Maxwell testified that he never ordered anyone to kill anyone, and that Eubanks could not have been an aider or abettor to a crime he had no knowledge of and could not participate in a plan to which he was not privy. (*Id.* at 126, 129-30.) Counsel argued Bell testified Eubanks did not have a knife, and although the codefendants testified Eubanks had a knife, the jury should

"consider the source," as they were cooperating with the State in exchange for their testimony. (*Id.*) Counsel argued Eubanks should not be punished for choosing the wrong people to spend his weekend with, that he never had knowledge of anything Jackson intended to do, and Eubanks was merely riding a long in that van on that fateful day, as stated in his interview with the District Attorney. (*Id.*)

At sentencing, Eubanks stated that he had a chance to plead out at the beginning of the case, and "they offered me plea deals, more than just one, and I didn't take any of them," and he could have testified against his codefendants, but "chose not to" and instead put his "fate in the hands of 12 jurors," which is what he meant when he said he was taking it to the box. (ECF No. 80-3 at 119-20.)

The Nevada Supreme Court ruled counsel was not ineffective as significant evidence pointed to Eubanks's involvement as a principal and he did not show discussion about aider and abettor liability would have affected his decision to proceed to trial:

> [E]ubanks claimed that trial counsel failed to explain the elements of first-degree murder and aiding and abetting liability. He contended that had he known that he could be subject to liability for aiding and abetting, he would have accepted the guilty plea offer. Eubanks failed to demonstrate that counsel's performance was deficient or that he was prejudiced. Witnesses testified that Eubanks walked toward the trailer where the crimes occurred carrying knives, told his confederate, Troy Jackson, that they had been given a "green light" to kill Michael Frasher, and then started to stab Frasher while Jackson attacked Antoinette Bell, who was also present. After his arrest, Eubanks admitted to multiple people that he killed Frasher. As significant evidence pointed to Eubanks' involvement as a principal, he failed to demonstrate that any discussion concerning abetting liability would have affected his decision to proceed to trial. Therefore, the district court [did not err] in denying this claim.

(ECF No. 27-15 at 4.)

The Nevada Supreme Court's application of *Strickland* and *Lafler* is objectively reasonable. The record supports the state supreme court's determination that further explanation of the aider and abettor theory of liability did not prejudice Eubanks because he has not shown there is a reasonable probability it would have affected his decision whether to go to trial or plead guilty. Against counsel's advice, Eubanks rejected the initial plea offer to robbery with use of a deadly weapon after the preliminary hearing testimony

1    established that Bell claimed Jackson, not Eubanks, stabbed Frasher and Bell. *See*

2    *supra*, pp. 3-4. Eubanks told his counsel he would accept nothing less than a plea to an

3    accessory charge. *See infra*, p. 59. The defense at trial was based on a theory that

4    Eubanks did not know of Jackson's plans to harm Frasher and Bell and that Eubanks ran

5    away from the scene while Jackson stabbed the victims. *See supra*, p. 5.

6          Assuming arguendo that the state supreme court was unreasonable in its

7    determination that advice concerning aider and abettor liability would not have affected

8    Eubanks's decision whether to accept a plea offer or proceed to trial, it was reasonable

9    in its determination that Eubanks fails to establish counsel's performance was deficient.

10   When considering an IAC claim, it is "strongly presumed" that counsel "rendered

11   adequate assistance and made all significant decisions in the exercise of reasonable

12   professional judgment" and "the burden to 'show that counsel's performance was

13   deficient' rests squarely on the defendant." *See Burt*, 571 U.S. at 22-23 (internal citations

14   omitted). At sentencing, Eubanks addressed the trial court, but did not state that he

15   misunderstood the aider and abettor law; instead, he said he decided against the plea

16   offers that were presented to him because he chose not to cooperate against his

17   codefendants, and instead placed his fate in the hands of the jury. *See infra*, p. 39. In his

18   *pro se* state postconviction proceeding, Eubanks authored two declarations, but neither

19   addressed Eubanks's allegations that trial counsel failed to explain the elements of

20   murder and aiding and abetting; and Eubanks presented no evidence to support this claim

21   apart from his bare allegations and the existing state-court record. (ECF No. 26 at 5-8,

22   121-22.) When reviewing a claim of ineffective assistance of counsel, "the absence of

23   evidence cannot overcome the strong presumption that defense counsel's conduct fell

24   within the wide range of reasonable professional assistance." *Burt*, 571 U.S. at 23.

25   Without a basis to conclude counsel gave incorrect advice or evidence counsel failed to

26   give material advice, it was reasonable to conclude Eubanks did not establish counsel's

27   performance was deficient under *Strickland*.

28          The Nevada Supreme Court's determinations are neither contrary to nor constitute

an unreasonable application of *Strickland* and are not based on an unreasonable determination of fact considering the evidence presented in the state court proceeding. Ground 5(3) is denied. However, the Court will issue a COA as to this ground.

### 5. Ground 5(4)—Request Venue Change and Transcript

Eubanks also alleges that trial counsel was ineffective in failing to request a change of venue and failing to ensure the jury selection proceedings were transcribed to permit adequate review of the record for appeal. (ECF No. 43 at 32-33.) He alleges failure to seek a new venue was deficient because (1) the crime occurred in a small town where inhabitants were familiar with each other, and the jury pool was insufficient, thus depriving Eubanks a fair and impartial juror; (2) publicity generated by local newspapers and television contaminated the minds of the residents of the small town of Pahrump, Nevada, thereby depriving Eubanks the ability to find an impartial juror; and (3) some jurors attended the same church as the prosecutor wherein they shared the same philosophical beliefs which gave an unfair advantage to the prosecutor based solely on the jurors' religious beliefs. (*Id.*) He further alleges failure to request transcription of the jury selection process deprived him the ability to research possible claims that would have been presented on direct appeal and present facts in support of this claim. (*Id.*)

Respondents argue Eubanks failed to show a request for change of venue would have been granted or counsel was required to ensure the jury selection was transcribed. (ECF No. 72 at 38.) They also argue there is no evidence the alleged familiarity of the jurors with other parties involved in the trial would influence the outcome of the proceeding given the overwhelming evidence of Eubanks's guilt. (*Id.*)

"'The standards governing a change of venue ultimately derive from the due process clause of the fourteenth amendment which safeguards a defendant's sixth amendment right to be tried by 'a panel of impartial, indifferent jurors.'" *Casey v. Moore*, 386 F.3d 896, 906 (9th Cir. 2004) (quoting *Irvin v. Dowd,* 366 U.S. 717, 722 (1961)). "Accordingly, a trial judge must grant a motion for change of venue if prejudicial pretrial publicity makes it impossible to seat an impartial jury." *Ainsworth v. Calderon*, 138 F.3d

787, 795 (9th Cir. 1998). To support a motion to transfer venue based on lack of impartiality in the jury pool, a criminal defendant must show either presumed or actual prejudice. *See id.* "To establish actual prejudice, the defendant must demonstrate that the jurors exhibited actual partiality or hostility that could not be laid aside." *Id.* To establish "presumed prejudice," the petitioner must show "the community where the trial was held was saturated with prejudicial and inflammatory media publicity about the crime." *Id.* In addition, the petitioner must show there is a "reasonable likelihood" the prejudicial news coverage "prevent[ed] a fair trial." *Casey*, 386 F.3d at 906-07. "'A presumption of prejudice' because of adverse press coverage 'attends only the extreme case.'" *Hayes v. Ayers*, 632 F.3d 500, 508 (9th Cir. 2011) (quoting *Skilling v. United States*, 561 U.S. 358, 381 (2010)).

The Nevada Supreme Court found Eubanks did not demonstrate that the relationships he identified rendered any potential juror unfairly biased against him, or that failure to transcribe the jury selection hindered counsel's ability to raise claims on appeal:

> [E]ubanks claimed that trial counsel was ineffective for failing to request a change of venue or have the jury selection transcribed. He asserted that the crime occurred in a small town where people were familiar with each other and many of the potential jurors attended the same church as the district attorney. However, Eubanks did not allege that these relationships rendered any of the jurors or potential jurors unfairly biased against him. *See Sonner v. State*, 112 Nev. 1328, 1336, 930 P.2d 707, 712-13 (1996) (recognizing that a defendant seeking a change of venue must "demonstrate actual bias on the part of the jury empaneled"), *modified on rehearing on other grounds by* 114 Nev. 321, 955 P.2d 673 (1998). Further, Eubanks failed to identify an empaneled juror who was biased against him and therefore did not demonstrate that the failure to transcribe the jury selection hindered appellate counsel's ability to raise claims on appeal. *See Daniel v. State*, 119 Nev. 498, 508, 78 P.3d 890, 897 (2003) (recognizing that the failure to record part of the proceedings is not grounds for reversal in and of itself but an appellant must demonstrate the missing record was so significant that the appellate court could not meaningfully review the appeal). Therefore, the district court did not err in denying this claim.

(ECF No. 27-15 at 4-5.) The Nevada Supreme Court's application of *Strickland* and determinations are objectively reasonable.

Eubanks did not demonstrate appellate counsel's failure to order the transcripts of jury selection fell below an objective standard of reasonableness or resulting prejudice.

At the start of jury selection, the trial court informed the venire the jury selection proceedings were videotaped, and a court reporter recorded everything. (ECF No. 21-46 at 29.) The jury *voir dire* was reported, but not apparently transcribed for appellate purposes. (*Id.* at 32.) Trial counsel was present for jury selection and represented Eubanks for his appeal. (ECF Nos. 21-46 at 2; 25-22 at 2.) The appeal raised five claims, none of which concerned jury selection. (ECF No. 25-22 at 4.) Although Eubanks faults counsel for failing to obtain a transcript of the jury selection, Eubanks did not offer this Court the transcripts or the videotapes of the jury selection, to support his claims. And although Eubanks alleged that certain jurors went to the same church as the prosecutor and thus must share some beliefs, Eubanks fails to identify any shared beliefs or show that those beliefs caused jurors to be biased against him. Eubanks thus fails to establish his counsel's failure to obtain the transcripts prevented meaningful review of the appeal (ECF No. 25-26) or that trial counsel's failure to order the transcript fell below an objective standard of reasonableness under the circumstances or resulted in prejudice.

Eubanks also fails to overcome the presumption that trial counsel's failure to move for a change of venue was reasonable or demonstrate a reasonable probability the motion would have been granted. Eubanks failed to demonstrate that any venireperson was biased against Eubanks or that the alleged relationships of the venirepersons with each other, or with the district attorney by virtue of their attendance at the same church, rendered any juror biased against Eubanks. Moreover, Eubanks provided no evidence of any media publicity concerning the crimes to support his claim that the venire was presumptively biased based on a saturation of prejudicial and inflammatory media publicity about the crime in the community, such that he was unable to receive a fair trial.

The Nevada Supreme Court's determinations are neither contrary to nor constitute an unreasonable application of clearly established federal law as determined by the Supreme Court and are not based on an unreasonable determination of fact considering the evidence presented in the state court proceeding. Ground 5(4) is denied.

1          **6.      Ground 5(5)—Character witnesses for penalty phase.**

2          Eubanks next alleges trial counsel rendered ineffective assistance by failing to call

3   any character witnesses during the penalty phase of the trial, including Ann M. Eubanks

4   (Eubanks's grandmother), Kristopher J. Baxter (Eubanks's brother), and Irma M. Romano

5   (Eubanks's friend and ex-girlfriend) to rebut the State's character evidence, and that he

6   was prejudiced because it relegated him to a sentence of life imprisonment without the

7   possibility of parole. (ECF No. 43 at 36-38.) He alleges he asked trial counsel to call those

8   individuals as witnesses to testify at sentencing that Eubanks could not have committed

9   the crimes based on his character and to give the jury an understanding of what type of

10  person Eubanks was to those witnesses. (*Id.*) He alleges that failure to call those

11  witnesses prevented Eubanks from presenting testimony that he was caring and

12  sympathetic with his friends and family. (*Id.*) Respondents argue counsel's performance

13  was not deficient because counsel tried to explain how Eubanks could have committed

14  the crime by explaining Eubanks's difficult upbringing through a mitigation expert. (ECF

15  No. 72 at 39.) They argue Eubanks fails to demonstrate character witnesses were

16  available and willing to testify or that the testimony would have resulted in a different

17  sentence, and testimony that Eubanks was not the kind of person to commit murder was

18  irrelevant at sentencing. (*Id.*)

19         At the penalty phase, the defense presented the testimony of Clinical Psychologist

20  and Mitigation Specialist Dr. Lyndsay Elliott. (ECF No. 80-3 at 54-55.) Her report and

21  findings were based on conversations with Eubanks, his brother, grandmother, and good

22  friend, Irma Romano. (*Id.* at 64-65, 73-74.) Elliott learned Eubanks has a "family history

23  of suicide, mental illness, [and] substance abuse." (*Id.* at 57.) There was "a lot of domestic

24  violence" between Eubanks's parents. (*Id.* at 58.) Eubanks was exposed to drugs in utero

25  because his mother was a drug addict, and Elliott opined that Eubanks likely has

26  neuropsychological effects from that experience. (*Id.* at 56-58.)

27         Dr. Elliott testified she learned Eubanks's mother worked as a cocktail waitress.

28  (*Id.*) When Eubanks was 13 years old, he was not seat-belted and was thrown from his

1    mother's vehicle during a traffic accident. (*Id.* at 63-64.) Eubanks suffered a head injury,

2    and partial coma, for which he stayed at University Medical Center for three weeks. (*Id.*

3    at 63-66.) Elliott stated a neuropsychologist would be needed to assess which parts of

4    Eubanks's brain were impacted. (*Id.*) Eubanks told Elliott he found his mother passed out

5    from a drug overdose and later with a self-inflicted gunshot wound. (*Id.* at 58.)

6           Dr. Elliott testified she learned Eubanks's father was an alcoholic and drug addict,

7    who physically abused Eubanks's older half-brother, and Elliott opined Eubanks's father

8    was likely schizophrenic. (*Id.* at 56-59.) Eubanks lived with his father for a short time when

9    he was seven years old. (*Id.*) Eubanks was in a vehicle accident with his father, and his

10   father left to obtain help, leaving seven-year-old Eubanks by himself, until Eubanks found

11   his father drunk in a bar. (*Id.*) Eubanks was seven years old when his father first started

12   hitting him over the head with a closed fist. (*Id.*) When Eubanks lived with his father, there

13   was not enough food, so Eubanks kept food in his room, for which his father punished

14   him by hitting him over the head. (*Id.* at 61.)

15          Dr. Elliott testified she learned Eubanks was "running the streets with the Donna

16   Street Crips" when he was six or seven years old. (*Id.* at 59-60, 70-71.) Eubanks claimed

17   he carried a knife for protection. (*Id.* at 60-62.) When Eubanks was nine years old, he

18   could be out at night and there was no expectation that he returns home. (*Id.* at 59-60.)

19   Eubanks got into trouble with police when he was 11 years old, self-identified as a Donna

20   Street Crip, had a dozen arrests, and lived half of his life in custody. (*Id.* at 59-60.) When

21   Eubanks was 10, his mother gave up custody to Eubanks's brother. (*Id.*)

22          Dr. Elliott testified Eubanks suffered from lack of stability and academic failure as

23   he did not attend school regularly. (*Id.* at 58.) Elliott did not know whether Eubanks was

24   provided an Individualized Education Program ("IEP"). (*Id.* at 59.) Elliott learned Eubanks

25   had a problem with concentration and his history includes a bipolar-disorder diagnosis.

26   (*Id.* at 62.) Although she was not an evaluating psychologist, Elliott believed Eubanks met

27   the criteria for complex trauma and mood disorder. (*Id.* at 63.) Elliott learned Eubanks

28   suffered post-traumatic stress, nightmares, inability to concentrate, inability to think

clearly, and depression. (*Id.*) Elliott said the genogram attached to her report shows "flagrant mental illness." (*Id.*)

Dr. Elliott concluded Eubanks is a little boy in a grownup body, and has no ability to foresee consequences, appraise risk, take care of himself, and uses drugs to modulate his affect. (*Id.* at 60.) Because he was repeatedly traumatized, she said he lacks the ability to protect and could not enter a situation and realize, "Oh, this looks bad. I'm going to get myself out of it." (*Id.*) She said, "he just presents himself as a much more inflated self-ego in order to protect against the interpersonal vulnerability that he feels." (*Id.* at 62.) A deputy at the prison told her he's never had trouble with Eubanks. (*Id.* at 85.) Elliott opined Eubanks needs "a really good neuropsychic eval to understand the strengths and weaknesses of his brain" and "to be psychiatrically evaluated to understand whether or not medications would be helpful." (*Id.*)

During the initial state postconviction proceeding, Eubanks submitted an affidavit stating that during his pretrial discussions with trial counsel, he asked whether he could have character witnesses at his trial and, if so, he would like to call his grandmother, his brother, and his friend. (ECF No. 26 at 121.) Eubanks stated his attorney responded, "We'll see," but none of his family or friends ever received a call or anything to indicate that trial counsel attempted to gather character witnesses. (*Id.* at 121-22.)

During the initial state postconviction proceeding, Eubanks's brother, Baxter, submitted two notarized affidavits. (*Id.* at 9-10, 126-28.) Baxter relayed that he is Eubanks's older brother and was Eubanks's legal guardian for years. (*Id.*) Baxter knew Eubanks "to have severe problems with concentration, problem solving," "always struggled in school," has a "history of poor judgment," was diagnosed with ADD and ADHD when he was in the third grade and was diagnosed with bipolar disorder after his mother's death. (*Id.*) When Eubanks was 12 or 13 years old, he and his mother were in a "bad car accident" and Eubanks was hospitalized in a coma for a week or so and had to learn how to walk again while he was in the hospital. (*Id.*) Baxter knew Eubanks "to do drugs and alcohol since he was a young adult." (*Id.*) Eubanks used to work at Baxter's

handyman business and was a good worker and good with clients. (*Id.*) Baxter knew Eubanks "to have a good heart, always respectful, especially with elders." (*Id.*) Defense counsel "never" got in touch with Baxter about testifying for Eubanks; rather, Baxter had to "get ahold of him" but counsel referred Baxter to the defense investigator. (*Id.*) Baxter told the defense investigator Eubanks "had been in and out of juvenile and moved from group home to group home, never having a stable familial environment," Eubanks is "basically illiterate because he never went to any school for any length of time," and, after the suicide of Eubanks's mother, Eubanks "went off the deep end", and "went deeper into drugs and alcohol," but, Eubanks "would never commit murder." (*Id.*) Had trial counsel requested Baxter as a witness for Eubanks's character, he would testify to all the things in his affidavit and why he could not believe Eubanks committed the crimes. (*Id.*)

In his initial state postconviction proceeding, Eubanks submitted a declaration from his grandmother. (*Id.* at 123-25.) In it, Ms. Eubanks stated she was "in all of" Eubanks's life and knew he made a lot of poor choices, but she did not believe he is a bad person because "he is the kind of person people can count on when you're in need of help." (*Id.*) Eubanks used to check on her all the time to see if she was okay and whether she needed anything or needed anything done around the house and would help her get and make food when she wasn't able to do it herself. (*Id.*) He would visit her when she was in the hospital to make sure she was comfortable and happy and take care of her errands while she was there. (*Id.*) When they had a death in the family, Eubanks was there for her, and he was like that for all his family and friends. (*Id.*) Defense counsel never reached out to Eubanks's grandmother to be a character witness, but if he had, she would have testified to the things in her affidavit and "describe and show the loving, caring, passionate person" she knows her grandson to be, and that she believes from the bottom of her heart that he could not have committed the crimes. (*Id.*)

"[T]he *Strickland* standard governs counsel's obligation to investigate and present mitigating evidence at sentencing." *Cox v. Del Papa*, 542 F.3d 669, 678 (9th Cir. 2008) (citing *Wiggins v. Smith*, 539 U.S. 510 (2003)). A Court must, in assessing attorney

48

performance, ask "whether the investigation supporting counsel's decision not to introduce mitigating evidence . . . *was itself reasonable*." *Wiggins*, 539 U.S. at 523. The Supreme Court has held counsel's failure to uncover and present voluminous mitigating evidence at sentencing could not be justified as a tactical decision where counsel had not "fulfilled their obligation to conduct a thorough investigation of the defendant's background." *Williams*, 529 U.S. at 396.

The Nevada Supreme Court determined Eubanks did not establish counsel's failure to introduce character witness testimony was unreasonable:

> [E]ubanks claimed that trial counsel was ineffective for failing to call character witnesses during the penalty phase of trial who would have testified that he could not have committed the crime based on the type of person he is. As the question of Eubanks guilt was not relevant to the penalty phase of trial, *see Gallego v. State*, 117 Nev. 348, 368, 23 P.3d 227, 241 (2001), *abrogated on other grounds by Nunnery v. State*, 127 Nev. 749, 263 P.3d 235 (2011), he failed to demonstrate that counsel's decision to not introduce this testimony was unreasonable, *see Doleman v. State*, 112 Nev. 843, 848, 921 P.2d 278, 280-81 (1996) (noting that whom to call as a witness "is a tactical decision that is 'virtually unchallengeable absent extraordinary circumstances'" (quoting *Howard v. State*, 106 Nev. 713, 722, 800 P.2d 175, 180 (1990), *abrogated on other grounds by Harte v. State*, 116 Nev. 1054, 1072, 13 P.3d 420, 432 (2000)). Therefore, the district court did not err in denying this claim.

> [FN 1] To the extent that Eubanks claimed that trial counsel was ineffective for not introducing this testimony during the guilt phase of trial, he failed to demonstrate prejudice given the overwhelming evidence of guilt.

(ECF 27-15 at 5-6.)

The Nevada Supreme Court's application of *Strickland* and determinations are objectively reasonable. Trial counsel investigated information for mitigation purposes from Eubanks's brother, grandmother, and friend, through the defense investigator, who spoke with Baxter, and Dr. Elliott, who spoke with Eubanks, his brother, grandmother, and friend. *See supra*, pp. 45-47. Dr. Elliott's testimony at the penalty phase relayed their statements to her, which are largely replicated in the affidavits and declaration that Eubanks presented in his initial postconviction proceeding. *Id.* at 45-48. At the penalty phase, the state district court instructed jurors, "In your deliberation, you may not discuss or consider the subject of guilt or innocence of a defendant, as that issue has already

been decided. Your duty is confined to a determination of the punishment to be imposed." (ECF No. 25 at 90.) Thus, to the extent Baxter and Ms. Eubanks would have testified they did not believe Eubanks could have or did commit the crimes alleged, the state supreme court reasonably determined counsel's failure to call those witnesses to give such testimony did not fall below an objective standard of reasonableness because guilt was not relevant during the penalty phase of the trial. Moreover, Eubanks has not established a reasonable probability the result of the sentencing proceeding would have been different had trial counsel called Eubanks's brother, grandmother, and friend as witnesses during the penalty phase as the jury was informed by Dr. Elliott of the substance of the remarks of those witnesses. And the state supreme court was reasonable in its determination that there is no reasonable probability the result of the proceeding would have been different had counsel called the mitigation witnesses during the guilt-phase of the trial. For these reasons Ground 5(5) is denied.

### 7.    Ground 5(6)—Methamphetamine abuse expert

Eubanks further alleges trial counsel was ineffective for failing to utilize an expert on methamphetamine abuse to provide evidence that Eubanks lacked malice aforethought to commit murder or to aid and abet murder and to discredit the State's witnesses who were methamphetamine abusers. (ECF No. 43 at 39-42.) He alleges an expert would have testified chronic methamphetamine users are "often unable to answer simple questions that require orientation (to person, place, date, and circumstances of the evaluation), attention, and memory"; a defendant who is a chronic methamphetamine user "may have genuine mental disorder," and an "impaired capacity to stand trial," due to "fabrication or exaggeration (e.g., malingering in the context of genuine disorder)"; "[t]he paranoia which results from methamphetamine abuse may cause distrust and withholding information"; and "recall of the alleged offense may be distorted and fragmentary." (Id.) He claims that, because the codefendants were methamphetamine abusers, the failure to call an expert witness allowed their testimony to stand unchallenged. (Id.)

1    Respondents argue Eubanks makes unsupported allegations about what an

2    expert would have offered at trial, and even if an expert gave the purported testimony,

3    Eubanks has not established such testimony would negate the *mens rea* element for

4    murder or demonstrate that Eubanks was under the influence of methamphetamine at the

5    time he committed the murder. (ECF No. 72 at 39-40.) They argue an expert would have

6    undermined Eubanks's defense that he did not commit the murder because his defense

7    was not that he committed the murder because he was under the influence of

8    methamphetamine. (*Id.*) They further contend Eubanks was not prejudiced because there

9    was overwhelming evidence that Eubanks possessed the *mens rea* for the offense and

10   the expert testimony would not have undermined the testimony of the State's witnesses.

11   (*Id.*)

12       In his initial state postconviction proceedings, Eubanks submitted a declaration

13   stating he informed counsel he used methamphetamine and other drugs daily, beginning

14   when he was nine years old, except when incarcerated, and was under the influence of

15   methamphetamine during the incident. (ECF No. 26 at 7.) He offered as evidence the

16   Metro Forensic Laboratory Report of Examination stating Eubanks's blood, taken at

17   arrest, contained methamphetamine. (*Id.* at 81.) He offered test results demonstrating

18   that Jackson, Maxwell, Garcia, Bell, and Rubio, tested positive for methamphetamine

19   based on samples taken after their arrest. (*Id.* at 82-88.) He offered a scholarly article that

20   includes chapters about Methamphetamine Abuse and Mitigation to Murder. (*Id.* at 13.)

21       In Nevada, intoxication may be considered for the purpose of determining intent:

22       No act committed by a person while in a state of voluntary intoxication, shall
         be deemed less criminal by reason of his or her condition, but whenever the
23       actual existence of any particular purpose, motive or intent is a necessary
         element to constitute a particular species or degree of crime, the fact of the
24       person's intoxication may be taken into consideration in determining the
         purpose, motive, or intent.
25

26   NRS § 193.220. The Nevada Supreme Court has held that "[i]n order for a defendant to

27   obtain an instruction on voluntary intoxication as negating specific intent, the evidence

28   must show not only the defendant's consumption of intoxicants, but also the intoxicating

1    effect of the substances imbibed and the resultant effect on the mental state pertinent to

2    the proceedings." *See Nevius v. State*, 699 P.2d 1053, 1060 (1985) (finding no instruction

3    on intoxication warranted because, although there was evidence of alcohol and marijuana

4    consumption, there was no evidence the defendant was intoxicated at the time of the

5    killing) (citing e.g., *Williams v. State*, 665 P.2d 260 (1983)).

6        The Nevada Supreme Court determined Eubanks failed to establish counsel was

7    ineffective in failing to introduce expert testimony, as multiple witnesses gave similar

8    accounts that Eubanks stabbed Frasher to death and admitted he did so:

9        [E]ubanks claimed that trial counsel was ineffective for failing to call
         an expert on methamphetamine abuse, as the witnesses against him were
10       methamphetamine abusers. Further, the expert could have testified that as
         an abuser himself, Eubanks could not have possessed malice aforethought
11       prior to the murder. We disagree. Given that multiple witnesses provided
         similar accounts that Eubanks stabbed Frasher to death and admitted to
12       doing so to enforce a drug debt, he failed to demonstrate that trial counsel
         acted unreasonably in not seeking out such an expert, *see id.*, or that he
13       was prejudiced by the failure to introduce this testimony. Therefore, the
         district court did not err in denying this claim.

14   (ECF No. 27-15 at 6.)

15       The Nevada Supreme Court's application of *Strickland* and determination that trial

16   counsel's failure to call a methamphetamine-abuse expert was neither deficient nor

17   prejudicial is objectively reasonable. The defense was based on Bell's prior statements

18   and testimony that Jackson, not Eubanks, stabbed Frasher. Two jailhouse informants

19   testified Eubanks stated he had no desire to plead guilty and intended to take the case to

20   trial. An objectively reasonable trial attorney could choose to forego a methamphetamine

21   expert for purposes of an intoxication defense because, by definition, such a defense,

22   contrary to Eubanks's strategy, required Eubanks implicitly admit he stabbed Frasher.

23   Moreover, Eubanks fails to establish there is a reasonable probability of a different

24   outcome had counsel pursued an intoxication defense as evidence that a defendant was

25   voluntarily intoxicated at the time of killing does not preclude a finding the killing was

26   willful, deliberate, and premeditated. *See* NRS §193.220.

27       Eubanks argues a methamphetamine-abuse expert would have discredited the

28   witnesses. Defense counsel impeached Jackson and Garcia, who were present during

52

the crimes. And, although those two codefendants were methamphetamine users and may have been under the influence of methamphetamine at the time of the offenses, Eubanks's ex-girlfriend, codefendant Rubio, and four jailhouse informants, none of whom participated in the offenses, testified Eubanks later admitted he killed Frasher and at least one, Kaufman, testified Eubanks said he stabbed Bell. Under the circumstances, there is no reasonable probability the result of the proceeding would have been different had counsel called a methamphetamine abuse expert. Ground 5(6) is denied.

### 8.    Ground 5(7)—Objection to illegal sentence

Eubanks alleges trial and appellate counsel provided ineffective assistance by failing to object at sentencing and challenge on direct appeal the imposition of an illegal sentence for the conviction of attempted robbery with use of a deadly weapon. (ECF No. 43 at 42-44.) Eubanks alleges there is a reasonable probability the claim would have succeeded and would have resulted in a new sentencing hearing. (*Id.*)

At the relevant time, the punishment for attempted robbery was a minimum term of not less than one year and maximum of not more than 10 years. *See* NRS § 193.330(a)(2) *as enacted by* Laws 1997, p. 1178; NRS § 200.380(2), *as enacted by* Laws 1985, p. 1187. And imposition of a consecutive sentence for the use of a deadly weapon required a minimum term of not less than one year and a maximum term of not more than 20 years, not exceeding the sentence imposed for the crime. *See* NRS § 193.165(1), (2)(a)-(b).

The sentencing court misstated the maximum sentence for attempted robbery with use of a deadly weapon as 180 months. (ECF No. 80-3 at 118-19.) The sentencing court imposed the sentence for attempted robbery with use of a deadly weapon consecutive to the other sentences because Eubanks had "a bad record" and "did a horrible crime." (*Id.* at 123-24.) The judgment reflected a sentence of 72 to 180 months for attempted robbery plus an equal and consecutive sentence for the use of a deadly weapon. (ECF No. 25-2 at 3-4.)

Eubanks argued in his initial state postconviction petition that counsel was

ineffective in failing to object to the illegal sentence for attempted robbery with use of a deadly weapon at sentencing and on direct appeal. (ECF No. 26-1 at 39-42.) He argued he was prejudiced because counsel's failure to do so deprived him a new sentencing hearing. (*Id.*) The State conceded the sentence for attempted robbery with use of a deadly weapon was an illegal sentence and urged the state district court to impose the maximum 10-year sentence for attempted robbery and an identical consecutive sentence for the deadly weapon enhancement under NRS § 176.555 and 176.565, without holding a hearing. (ECF No. 26-5 at 2, 5-6.) The state district court did so by filing an amended judgment imposing a four-to-10-year sentence for attempted robbery and identical consecutive sentence for the use of a deadly weapon without changing the sentences for the other convictions. (ECF No. 26-6 at 4). Later, the state district court, again without a hearing, filed a second amended judgment containing the four-to-10-year sentence for attempted robbery and an identical consecutive sentence for the use of a deadly weapon, but decreased the sentence for the enhancement for attempted murder from eight to 20 years to four to 10 years. (*Compare* ECF Nos. 26-6 at 4 *with* 27-1 at 4.)

The Nevada Supreme Court determined that, based on the second amended judgment, Eubanks failed to show counsel was ineffective:

> [E]ubanks claimed that trial and appellate counsel were ineffective for failing to object to the court illegally sentencing him. He asserted that the district court sentenced him to a term greater than the maximum sentence for attempted robbery with the use of a deadly weapon. According to the second amended judgment of conviction, the district court sentenced Eubanks to two consecutive terms of four to ten years in prison for attempted robbery with the use of a deadly weapon. As these sentences were within the proscribed statutory limits, *see* NRS 193.330(1)(a)(2); NRS 193.165; NRS 200.380, counsel were not deficient in failing to challenge the sentences. Therefore, the district court did not err in denying this claim.

(ECF No. 27-15 at 6-7.)

The Nevada Supreme Court unreasonably applied *Strickland* in its determination that neither counsel performed deficiently. Although the amended judgment and second amended judgment each imposed sentences within the statutory limits, neither of those judgments existed at the time of trial and appellate counsel's performance. *See*

1     *Strickland*, 466 U.S. at 689 (stating that a fair assessment of attorney performance

2     requires a court to evaluate the reasonableness of counsel's conduct from counsel's

3     perspective at the time"). A reasonable trial attorney would have objected to the illegal

4     sentence at the sentencing hearing, and a reasonable appellate attorney would have

5     challenged on appeal the illegal sentence imposed by the original judgment. Because the

6     Nevada Supreme Court decision was based on an unreasonable application of *Strickland*,

7     the Court reviews this claim de novo. *See Panetti v. Quarterman*, 551 U.S. 930, 948

8     (2007) ("As a result of [the state court's] error, our review of petitioner's underlying . . .

9     claim is unencumbered by the deference AEDPA normally requires."); *Hurles v. Ryan*,

10     752 F.3d 768, 778 (9th Cir. 2014) ("If we determine, considering only the evidence before

11     the state court, that . . . the state court's decision was based on an unreasonable

12     determination of the facts, we evaluate the claim de novo.").

13         The Court finds trial and appellate counsel rendered deficient performance and

14     there was a reasonable probability that, had counsel objected at sentencing or pursued

15     the claim on direct appeal, the sentence would have been corrected. However, contrary

16     to Eubanks's claim, there is no basis to conclude that he necessarily would have received

17     a resentencing hearing. The state district court had the power to correct the illegal

18     sentences "at any time" and it already did so. *See* NRS § 176.555. *See also Edwards v.*

19     *State*, 918 P.2d 321, 324 (1996) (acknowledging a Nevada state court has inherent

20     authority to correct a facially illegal sentence). And assuming arguendo that Eubanks

21     would have been entitled to a new sentencing hearing, he fails to establish a reasonable

22     probability a new sentencing hearing would have resulted in more favorable sentences

23     than those contained in the second amendment judgment. Under the circumstances, the

24     IAC claims in Ground 5(7) are moot, or alternatively, fail on *Strickland's* prejudice prong.

25     Ground 5(7) is denied. However, the Court will issue a COA on this ground.

26        **E.**      **Grounds 5(8-15)—Procedurally Defaulted IAC Claims**

27         The Court previously ruled that Grounds 5(8)-(15) are unexhausted by procedural

28     default subject to Eubanks's ability to overcome the default under *Martinez*. (ECF No. 67

at 6.)

### 1. Standards for evaluating procedurally defaulted claims

For claims of ineffective assistance of trial counsel, a federal habeas court may excuse procedural default, where: (1) the claim of ineffective assistance of trial counsel is "substantial"; (2) there was "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) state law *requires* an "ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding." *Trevino v. Thaler*, 569 U.S. 413, 423 (2013) (quoting *Martinez v. Ryan*, 566 U.S. 1, 18 (2012)). On all such issues, if reached, the Court's review is *de novo. See, e.g.*, *Atwood v. Ryan*, 870 F.3d 1033, 1060 n.22 (9th Cir. 2017); *Detrich v. Ryan*, 740 F.3d 1237, 1246-48 (9th Cir. 2013).

Eubanks was not represented by counsel during the initial state postconviction review proceedings. (ECF Nos. 27-4; 27-6.) Nevada law requires prisoners to raise IAC claims for the first time in a state petition seeking postconviction review, which is the initial collateral review proceeding for purposes of applying the *Martinez* rule. *See Rodney v. Filson*, 916 F.3d 1254, 1259-60 (9th Cir. 2019). Thus, for Grounds 5(8)-(15), the Court need consider only whether the IAC claims are "substantial" under *Martinez*.

"The Supreme Court has said little about the meaning of 'substantial,' but has cited as analogous the standard for granting a certificate of appealability under 28 U.S.C. § 2253." *Leeds v. Russell*, 75 F.4th 1009, 1018 (9th Cir. 2023) (citing *Martinez*, 566 U.S. at 14). "For a certificate of appealability to issue, a habeas petitioner must show 'that reasonable jurists could debate whether the issue should have been resolved in a different manner or that the claim was adequate to deserve encouragement.'" *Id.* (quoting *Apelt v. Ryan*, 878 F.3d 800, 828 (9th Cir. 2017)). "Under that standard, '[a] court should conduct a 'general assessment of the[ ] merits,' but should not decline to issue a certificate 'merely because it believes the applicant will not demonstrate an entitlement to relief.'" *Id.* (alteration in original) (quoting *Miller-El*, 537 U.S. at 336-37).

"[T]he standard for evaluating the underlying trial counsel IAC claim during the *Martinez* prejudice analysis is not as stringent as that required when considering the merits of the underlying [*Strickland*] claim." *Leeds*, 75 F.4th at 1017-18 (citing *Michaels v. Davis*, 51 F.4th 904, 930 (9th Cir. 2022) ("[A] conclusion on the merits of [a trial counsel IAC] claim under *Strickland* holds a petitioner to a higher burden than required in the *Martinez* procedural default context, which only requires a showing that the [trial counsel IAC] claim is 'substantial.'")). An IAC claim "is insubstantial" if it lacks merit or is "wholly without factual support." *Martinez*, 566 U.S. at 14-16 (citing *Miller-El v. Cockrell*, 537 U.S. 322 (2003)).

### 2. Ground 5(8)—Competency as a defense

Eubanks alleges trial counsel was ineffective for failing to investigate Eubanks's competency as a defense to the crimes. (ECF No. 43 at 44-45.) He alleges counsel was informed, at the onset of the case, that Eubanks was incompetent; that Eubanks had a history of drug abuse, illiteracy, mental health issues, and traumatic childhood; and that Eubanks's competency issues were apparent to the mitigation expert. (*Id.*) He alleges counsel would have determined Eubanks was incompetent, which would have provided a defense, had counsel investigated competency before trial. (*Id.*)

Respondents argue Ground 5(8) lacks merit and should be dismissed as procedurally defaulted. (ECF No. 72 at 42-43.) They contend Eubanks fails to demonstrate he displayed signs that raised "a bona fide doubt" about his competency, that an evaluator would have determined he was incompetent to stand trial, or that he could not be restored to competency. (*Id.*) They argue Eubanks has not alleged incompetency such that he was insane at the time of the crimes and that incompetency to stand trial is not a defense. (*Id.*) They contend Eubanks relies on arguments and a psychosocial mitigation evaluation that were generated after the verdict. (*Id.*)

Ground 5(8) is insubstantial as it is wholly without factual support or merit. Nothing in the pretrial record establishes counsel was on notice that Eubanks lacked "sufficient present ability to consult with his lawyer with a reasonable degree of rational

understanding," or lacked "a rational as well as factual understanding of the proceedings against him." *See Godinez*, 509 U.S. at 396 (quoting *Dusky*, 362 U.S. 402). Dr. Elliott was hired posttrial for mitigation at sentencing and expressed no concern about Eubanks's competency or sanity after spending four and one-half hours interviewing him and speaking with his friend and family. (ECF Nos. 24-7; 80-3 at 54-87.) Eubanks fails to show drug abuse, illiteracy, mental health, and childhood trauma, gave counsel notice to investigate or harbor a doubt about competency as those experiences do not necessarily raise concerns about competency to stand trial (or alert counsel to an insanity defense).

To the extent Eubanks alleges counsel failed to investigate an insanity defense to the mental state required for the offenses, the claim is wholly without factual support or merit. As discussed, for insanity to act as a complete defense, Eubanks must satisfy the *M'Naghten* test—that is, "[d]ue to a disease or defect of the mind," he suffered delusions such that he did not "(1) [k]now or understand the nature and capacity of his . . . act; or (2) [a]ppreciate that his or her conduct was wrong." NRS § 174.035(6)(b); *Finger*, 27 P.3d at 72-73, 84-85. Eubanks does not demonstrate that he informed counsel he suffered delusions during the offenses. Mental health problems do not meet the *M'Naghten* test for insanity. *See Finger*, 27 P.3d at 72. All reasonable jurists would agree the failure to investigate insanity was not deficient.

To the extent Eubanks alleges that methamphetamine intoxication rendered him insane during the offenses, he fails to meet *M'Naghten's* requirement that an operative delusion results from a "mental disease or defect." *See, e.g.*, NRS § 174.035(10)(a) (stating an exonerating "[d]isease or defect of the mind" under Nevada's *M'Naghten* test "does not include a disease or defect which is caused solely by voluntary intoxication"). And, to the extent that he claims counsel failed to pursue an intoxication defense, Eubanks fails to establish deficient performance. Although an intoxication defense can defeat specific intent, it does not preclude a finding that a killing was willful, deliberate, and premeditated. *See* NRS § 193.220. Moreover, an intoxication defense is inconsistent with the defense at trial that Eubanks ran away and did not commit the stabbings. Thus,

a reasonable attorney could choose not to pursue an intoxication defense under the circumstances of this case.

Ground 5(8) is dismissed as procedurally defaulted as all reasonable jurists would agree Eubanks fails to establish a substantial claim that trial counsel was ineffective for failing to investigate competency or insanity as a defense.

### 3.      Ground 5(9)—Plea offers and counteroffers

Eubanks alleges trial counsel was ineffective in failing to (1) convey a plea offer from the State before counsel unilaterally rejected it, and (2) convey a counteroffer from Eubanks to the State due to counsel's belief the State would not accept it. (ECF No. 43 at 45-47.) Eubanks submits letters written to him by his counsel. (ECF Nos. 20-9; 20-13.) Respondents object to consideration of the letters arguing they are not included in the state-court record. (ECF No. 72 at 43.) They argue, even if considered, the letters show counsel communicated plea offers and counteroffers to Eubanks. (*Id.* at 43-44.)

### a.      Consideration of letters (ECF Nos. 20-9; 20-13)

Generally, the merits of claims raised in a federal habeas corpus petition are decided on the record that was before the state court when it adjudicated a claim. *See Cullen*, 563 U.S. at 180-81. AEDPA restricts a federal habeas court's authorization to hold an evidentiary hearing or consider evidence where an applicant failed to develop the factual basis for a claim in state court proceedings:

> (2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—
>
>    (A)    the claim relies on—
>
>       (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
>       (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
>    (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2)(A)-(B). Although § 2254(e)(2) refers to evidentiary hearings, the Supreme Court has interpreted its provisions to apply to consideration of evidence. *See McLaughlin v. Oliver*, 95 F.4th 1239, 1248-49 (9th Cir. 2024) (acknowledging "the Court in *Shinn* reaffirmed that [2254(e)(2)]'s restrictions also apply 'when a prisoner seeks relief based on new evidence *without* an evidentiary hearing'") (citing *Shinn v. Ramirez*, 596 U.S. 366, 389 (2022); *Holland v. Jackson*, 542 U.S. 649, 653 (2004)).

For purposes of determining whether a petitioner must meet the requisites of § 2254(e)(2), the term "fail" means "the prisoner must be 'at fault' for the undeveloped record in state court." *See Williams*, 529 U.S. at 432, 434 ("Under the opening clause of § 2254(e)(2), a failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel."). *See also Shinn*, 596 U.S. at 383 (affirming that § 2254(e)(2) applies "when a prisoner 'has failed to develop the factual basis of a claim'").

"Diligence for purposes of [§ 2254(e)(2)'s] opening clause depends upon whether the prisoner made a reasonable attempt, *in light of the information available at the time*, to investigate and pursue claims in state court; it does not depend . . . upon whether those efforts could have been successful." *Williams*, 529 U.S. at 435 (emphasis added). "While 'diligence' has not been precisely defined in this context, the Supreme Court has advised that '[d]iligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law.'" *Libberton v. Ryan*, 583 F.3d 1147, 1165 (9th Cir. 2009) (quoting *Williams*, 529 U.S. at 437).The Supreme Court has specified "[t]he proper question when considering a petitioner's diligence 'is not whether the facts could have been discovered but instead whether the prisoner was diligent in his efforts.'" *Id.* (citing *Williams*, 529 U.S. at 435.)

Eubanks was diligent during the initial state postconviction proceeding by submitting to the state courts exhibits, including notarized affidavits, to support claims raised by the state petition. (ECF No. 26.) Eubanks's requests for counsel and an evidentiary hearing were denied. (ECF Nos. 25-33; 25-34; 27-4; 27-6; 27-7; 27-13.)

1    Although the letters to support Ground 5(9) were written to Eubanks before his state

2    postconviction proceeding (ECF Nos. 20-9; 20-13) he did not raise this claim in that

3    proceeding. As he acted diligently in the initial state postconviction proceeding in raising

4    claims and developing the record, the Court will consider the letters for Ground 5(9).

5                    **b.      Analysis of Ground 5(9)**

6           "If a plea bargain has been offered, a defendant has the right to effective

7    assistance of counsel in considering whether to accept it. If that right is denied, prejudice

8    can be shown if loss of the plea opportunity led to a trial resulting in a conviction on more

9    serious charges or the imposition of a more severe sentence." *Lafler*, 566 U.S. at 168.

10   "[A]s a general rule, defense counsel has the duty to communicate formal offers from the

11   prosecution to accept a plea on terms and conditions that may be favorable to the

12   accused." *Missouri v. Frye*, 566 U.S. 134, 145 (2012) (holding that "[w]hen defense

13   counsel allowed the offer to expire without advising the defendant or allowing him to

14   consider it, defense counsel did not render the effective assistance the Constitution

15   requires"). To show prejudice from ineffective assistance of counsel where a plea offer

16   has lapsed or been rejected because of counsel's deficient performance, a defendant

17   must demonstrate (1) a reasonable probability he would have accepted the earlier plea

18   offer had he been afforded effective assistance of counsel, and (2) a reasonable

19   probability the plea would have been entered without the prosecution canceling it or the

20   trial court refusing to accept it, if they had the authority to exercise that discretion under

21   state law. *See id.* at 147.

22          In Eubanks's case, trial counsel, by letter dated April 9, 2012, confirmed Eubanks

23   rejected the prosecutor's last offer to plead guilty to murder with use of a deadly weapon.

24   (ECF No. 20-9 at 2-3.) And, because the prosecutor previously stated no other plea was

25   acceptable, counsel did not communicate to the prosecutor that Eubanks would consider

26   pleading guilty to accessory to murder and attempt accessory to murder:

27                 The last offer, extended by the prosecuting attorney . . . on or about
              December 16, 2012, was plead guilty to Murder with Use of a Deadly
28          Weapon. You rejected this offer and informed that the only offer you would
              consider is Accessory to Murder and Attempt Accessory to Murder. I have

1    not communicated your counter-offer to [the prosecutor] as he previously
2    informed me that he is prosecuting you for the murder of Michael Frasher
     and that your only offer at this stage is plead guilty to Murder with Use of
     Deadly Weapon.

3           While we have already discussed this, I need to reiterate the fact that
     as the client the following . . . areas are within your purview after
4    consultation with me . . . 2. Whether to accept a plea and/or what pleas to
     enter . . .. Basically, this means you decide settlement and I decide strategy,
5    procedure and tactical calls in the case . . . I have met with you and you
     have told me that you are innocent and that you wish to go to trial in this
6    matter.

7    (*Id.*) However, in a letter dated April 27, 2012, counsel informed Eubanks that on April 25,

8    2012, the prosecutor sent an email stating the State would accept a plea to two counts of

9    aiding and abetting the attempted first-degree murder of Frasher and Bell, and conspiracy

10   to commit murder with use of a deadly weapon, on certain conditions, including that

11   Eubanks testify against codefendant Maxwell. (ECF No. 20-13 at 2.) Trial counsel pasted

12   the email into counsel's letter to Eubanks:

13          If your client will <u>agree</u> to testify <u>truthfully</u> against Michael Maxwell, Jr.,
     specifically as to the "green light" phone call, we will allow him to plead guilty
14   to aiding and abetting the attempt first degree murder with use of a deadly
     weapon x 2, one for Frasher, one for Bell, and one count of conspiracy to
15   commit murder with use of a deadly weapon, the money, the gloves, the
     knives, the phone call. You would be allowed to ask for probation, we will
16   be free to argue.

17

18   (*Id.*) Counsel also conveyed in his letter to Eubanks that counsel clarified the State's offer

19   did not include a plea to accessory to murder:

20          [S]o offer is—principal liability for attempt murder w/use x 2 and conspiracy
     murder.
21          My evaluation of max exposure is: 8-10 with consecutive 8-20 for
     enhancement on the first attempt murder count. Probably will sentence [sic]
22   consecutive on all other counts—which means another 8-20 followed by
     consecutive 8-20 for the second attempt murder count.
23
            [F]ollowed by 4-10 consecutive 4-10 for the conspiracy murder count.
24          The reality is the judge is likely to run all counts consecutive and he is going
     to want to max Mr. Eubanks.
25
            Under my analysis, here, his bottom end number is 36 years. This does not
26   appear to be much of an improvement on the original offer of Murder 2nd
     degree with use.
27

28   (*Id.*) Counsel's letter stated counsel would see Eubanks in court on May 7, 2012. (*Id.*)

All reasonable jurists would agree that Eubanks's claim is insubstantial because it is wholly without merit. Based on the letters, trial counsel was not deficient in failing to communicate the State's offers to Eubanks. Trial counsel communicated the December 16, 2012, offer that Eubanks rejected. Counsel communicated the April 25, 2012, offer to Eubanks, and indicated they would see each other in court on May 7, 2012. Nothing in the April 27, 2012, letter indicates or suggests trial counsel unilaterally rejected the April 25, 2012, offer. The April 27, 2012, letter indicates that, as trial counsel advised in the April 9, 2012, letter, the prosecutor refused to entertain pleas to accessory charges.

Assuming arguendo that trial counsel was deficient in failing to communicate to the prosecutor that Eubanks would agree to plead guilty to accessory to commit murder and attempt accessory to murder, here nothing indicates there is a reasonable probability the prosecutor would have agreed to that arrangement, as trial counsel confirmed the State did not contemplate a plea to lesser accessory charges.

Because the IAC claim in Ground 5(9) is insubstantial, Eubanks fails to overcome the procedural default under *Martinez*. Ground 5(9) is therefore dismissed. However, the Court will issue a COA on this ground.

### 4.    Ground 5(10)—Investigation of venire

Eubanks alleges trial counsel was ineffective for failing to inquire into the criminal histories of the prospective jurors and their relationships with witnesses, court personnel, attorneys, and the crime scene. (ECF No. 43 at 47.) He claims it was unreasonable not to do so because of the small population of the city where the crimes occurred, the possibility jurors could be related to or familiar with parties and crime scenes, and the media coverage of the case. (*Id.*) He alleges, based on an investigator's posttrial declaration (ECF No. 38-5 at 9-10), that Maxwell's residence can be seen from the jury foreman's residence.

Respondents object to consideration of the statements of the posttrial investigator in her declaration on the grounds that it is not part of the state-court record. (ECF No. 72 at 44-45.) They also contend Eubanks provides no evidence that counsel did not

1    investigate the venire or inquire whether the foreman saw or visited the crime scenes,

2    and assuming the court may consider the posttrial declaration, they contend the claim is

3    insubstantial as it fails to establish the foreman resided within sight of Maxwell's residence

4    on the night of the investigation of the crimes. (*Id.*)

5         The Court finds, based on information known to Eubanks during the initial

6    postconviction review proceedings, that Eubanks acted diligently to develop the state-

7    court record. Eubanks may have had the address for the Maxwell residence, and the

8    name of the foreman, but nothing indicates he had the foreman's home address. (ECF

9    Nos. 21-28; 21-47; 24-3 at 7.) Eubanks did not have information that could lead him to

10   discover the foreman may have lived within viewing distance of the Maxwell residence,

11   and he was denied postconviction counsel, who could have obtained that information.

12   Thus, Eubanks need not meet the requisites of 28 U.S.C. § 2254(e)(2) for the Court to

13   consider the portion of the investigator's declaration concerning the jury foreman's

14   residence.

15        The investigator's posttrial declaration avers that "[o]n 2/3/17 I interviewed Richard

16   Flanagan, the foreman of Eubanks's jury, at his residence in Pahrump, NV. I observed

17   that the front portion of [Maxwell's address], the secondary crime scene, can be seen

18   from Mr. Flanagan's property." (ECF No. 38-5 at 9-10.) The declaration does not,

19   however, establish that the jury foreman was in residence at that location, or was home

20   in 2011 at the time of the investigation of Maxwell's residence or at the time of the trial in

21   2013. And the record fails to indicate that trial counsel, who knew the address for the

22   Maxwell residence, was provided the addresses for Flanagan or any of the prospective

23   jurors. Additionally, Eubanks failed to establish that trial counsel did not investigate or

24   inquire into the venirepersons' criminal history, relationships with the individuals involved

25   in the crimes, court personnel, attorneys or witnesses, or their knowledge of the crime

26   scene.

27        Because the claim is wholly without a factual basis or merit, Ground 5(10) is

28   insubstantial and dismissed as procedurally defaulted.

### 5.    Ground 5(11)—Polygraph

Eubanks alleges trial counsel was ineffective for failing to introduce, at trial and sentencing, evidence that Eubanks passed a polygraph examination, i.e., Certified Voice Stress Analyzer (CVSA), which allegedly indicated Eubanks told the truth on the night of the crimes when he stated he did not stab anyone. (ECF No. 43 at 48-49.) Respondents argue polygraph results are admissible only if the parties have signed a written stipulation, and Eubanks failed to establish the existence of a stipulation. (ECF No. 72 at 45-46.)

"In Nevada, polygraph results may be considered reliable when taken under proper conditions and with proper safeguards in place." *Jackson v. State*, 997 P.2d 121, 121-22 (2000) (citing *Corbett v. State*, 584 P.2d 704, 705 (1978)). "[T]he safeguards include the requirement of a written stipulation signed by the prosecuting attorney, the defendant, and his counsel providing for defendant's submission to the test." *Id.* (citing *Corbett*, 584 P.2d at 705). "Absent a written stipulation, polygraph evidence may properly be excluded." *Id.* (holding "[t]he district court, consistent with the decision in *Corbett,* properly excluded the test results for lack of a written stipulation by all of the parties below."). "[A]ny party to any criminal or civil action may refuse to agree to the stipulation of a polygraph test for any reason, or no reason at all." *Id.*

Eubanks fails to establish the State stipulated, or would have stipulated, to admission at trial or sentencing of the polygraph examination results, even if defense counsel had tried to obtain a stipulation. Thus, there is no merit to Eubanks's claim that trial counsel's failure to introduce the polygraph result was deficient or prejudicial under *Strickland*. Ground 5(11) is insubstantial and therefore dismissed as procedurally defaulted.

### 6.    Ground 5(12)—Objection to deposition testimony

Eubanks alleges trial counsel was ineffective for failing to object at trial to the introduction of deposition testimony of witnesses and for utilizing deposition testimony during trial. (ECF No. 43 at 49-50.) He contends counsel should have objected to the testimony as it is admissible only when a witness is unavailable to testify, and defendant

1  has a prior opportunity to cross-examine the witness. (*Id.*) (citing *Crawford v. Washington*,

2  541 U.S. 36 (2004)). Respondents contend none of the deposition testimony was

3  admitted as evidence, and Eubanks and his counsel were present during the pretrial

4  depositions. (ECF No. 72 at 46-47.) They argue Eubanks fails to establish a confrontation

5  clause violation because *Crawford* applies only to testimonial statements admitted for the

6  truth of the matter asserted in the statements and Eubanks fails to specify which

7  deposition testimony counsel should have objected to and should have refrained from

8  utilizing, thus preventing Respondents from fully responding to the claim. (*Id.*) In reply,

9  Eubanks alleges counsel was ineffective for utilizing deposition transcripts during cross-

10  examination of codefendants Garcia and Jackson, as it allowed the State to use that

11  deposition testimony to support or rehabilitate witnesses. (ECF No. 77 at 46-47.)

12       The State moved pretrial to take depositions of Garcia, Jackson, Karisma, Dowling,

13  Vich, Kaufman, and Rubio. (ECF Nos. 19-2; 20-14; 20-23; 21-14.) Trial counsel opposed

14  the motions. (*See, e.g.*, ECF Nos. 19-6; 20-22.) The motions were granted. (ECF Nos.

15  19-7; 19-15; 20-21; 21; 21-19; 79-4.) Trial counsel cross-examined the witnesses at those

16  depositions. (*Id.*) At trial, none of the depositions were admitted as evidence. (ECF Nos.

17  21-46; 23 at 4-6; 24-3; 79-6 at 4-8; 79-7 at 4-5; 80 at 3-4; 80-1 at 3-4; 80-2 at 3.) Thus,

18  there is no merit to the claims that counsel failed to object to admission of deposition

19  testimony or object that such testimony violated *Crawford*.

20       Eubanks also fails to establish there is any merit to his claims that trial counsel's

21  use of deposition testimony at trial was unreasonable or prejudicial. Eubanks alleges

22  counsel was ineffective in attempting to impeach Garcia with her deposition testimony

23  that she never saw Eubanks with knives in his hands when he exited the van. (ECF No.

24  77 at 46.) Eubanks, however, cites Rubio's trial testimony that she did not see Eubanks

25  with knives when he exited the van at Maxwell's residence after the stabbings (ECF Nos.

26  24, 80-1 at 42-46), not Garcia's testimony. Counsel's performance was not prejudicial as

27  other evidence established Eubanks had knives: Maxwell gave the knives found in the

28  firepit to Eubanks, Garcia saw Eubanks holding the knives under his armpits at the Bell

residence, and Jackson said Eubanks used those same knives to stab Frasher and Bell. *See supra* pp. 2-3. Eubanks also fails to establish counsel's performance was deficient or a reasonable probability the result of the trial would have been different had trial counsel refrained from using Jackson's prior deposition testimony that he did not see anyone stab Frasher; doing so impeached Jackson with his admission that he lied under oath during his deposition. Ground 5(12) is thus insubstantial and dismissed as procedurally defaulted.

### 7.    Ground 5(13)—Investigation of potential conflicts of interest

Eubanks alleges trial counsel was ineffective for failing to investigate the potential conflicts of interest of (1) attorney Allan Buttell who represented co-defendant Garcia and jailhouse informant Jarvis, and (2) attorney Carl Joerger who represented jailhouse informants Karisma, Dowling, and Jarvis, and the surviving victim Bell. (ECF No. 43 at 50-51.) He alleges the conflicts limited counsel's investigation and preparation for cross-examination of the witnesses at deposition and trial and limited advice to Eubanks. (*Id.*) Eubanks submits Nevada Court Case Summaries for Jarvis (ECF No. 33-1), Karisma (ECF No. 33-2), Dowling (ECF No. 35-3), and Bell (ECF No. 35). Respondents object that Eubanks relies on case summaries that are not part of the state-court record. (ECF No. 72 at 47-48.)

The Court may take judicial notice "of documents or facts 'not subject to reasonable dispute.'" *Trigueros v. Adams*, 658 F.3d 983, 987 (9th Cir. 2011) (taking judicial notice of records filed during state habeas proceedings) (citing Fed. R. Evid. 201(b)). In particular, the Court "may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue." *U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992); *see also, e.g.*, *Smith v. Duncan*, 297 F.3d 809, 815 (9th Cir. 2002) (taking judicial notice of the "relevant state court documents, because those documents have a direct relationship to [petitioner's habeas] appeal"). The Supreme Court has not held whether documents and information that may be judicially

1    noticed is included in the category of evidence subject to § 2254(e)(2)'s requirements.

2    The Court need not resolve that dilemma, as assuming the Court is permitted to consider

3    the case summaries (ECF Nos. 33-1; 33-2; 35; 35-3), Eubanks fails to establish a

4    substantial claim that trial counsel was ineffective for failing to investigate and object to

5    potential conflicts of interest of counsel for witnesses at trial.

6         Eubanks alleges attorney Buttell had information about the crime from his

7    representation of Garcia that could have been provided to Jarvis, and that could have

8    resulted in favorable plea deals and additional benefits for Garcia and Jarvis. (ECF No.

9    43 at 50-51.) Eubanks similarly alleges that attorney Joerger simultaneously represented

10   jailhouse informants Karisma and Dowling, and the surviving victim Bell, on matters

11   related to and/or pending when they testified during Eubanks's trial, and Joerger

12   previously represented jailhouse informant Jarvis. (*Id.*) Eubanks alleges that through his

13   multiple representations, Joerger knew information that could have been provided to and

14   used to the advantage of those witnesses. (*Id.*) Respondents contend Eubanks's claims

15   are speculative as there is no evidence Buttell and Joerger unethically provided

16   information to their clients or information that would have impeached or undermined the

17   testimony of those witnesses. (ECF No. 72 at 47-48.)

18        Eubanks's allegations of conflict of interest are wholly without merit. Eubanks was

19   not represented by either Buttell or Joerger and neither represented the opposing party

20   in Eubanks's criminal action. Assuming Eubanks could establish he has standing to seek

21   disqualification of Buttell and Joerger,[7] the Court agrees Eubanks's claim is speculative

22   and therefore insubstantial. Eubanks has not demonstrated trial counsel unreasonably

23   failed to seek disqualification of those attorneys as counsel for the witnesses based on

24   conflicts of interest, a reasonable probability counsel would have succeeded with such a

25   motion, or a reasonable probability the result of trial would have been different had

26

27        [7]See *e.g.*, *Liapis v. Dist. Ct.*, 282 P.3d 733 (2012) (holding a lawyer owes no
     general duty of confidentiality to nonclients, and thus, some sort of confidential or fiduciary
28   relationship must exist or have existed before a party may disqualify opposing counsel
     predicated on the actual or potential disclosure of confidential information.)

counsel done so.

Eubanks alleges that attorney Buttell's representation of Jarvis and Garcia led Jarvis to deflect Garcia's involvement in the crimes. But Eubanks fails to demonstrate how Jarvis deflected Garcia's involvement and, even assuming Jarvis did so, Garcia's involvement was undisputed: Garcia admitted she drove the van, stopped to buy gloves, knew what was happening in the camper, heard screaming, and did nothing to stop it. (ECF No. 23-1 at 94-98, 100-111, 118.)

Eubanks has not identified any testimony of witnesses Garcia, Karisma, Dowling, or Bell, that is the result of their mutual attorneys having shared information that was otherwise unknown to those witnesses, or that any of those witnesses received favorable treatment because those attorneys shared information about Eubanks's case with the witnesses. Such claims are speculative, and Eubanks fails to show a reasonable probability that impeaching the witnesses by demonstrating they were, at some point, represented by the same attorney, would have changed the outcome of Eubanks's trial.

Ground 5(13) is speculative and dismissed as procedurally defaulted.

### 8. Ground 5(14)—Objection to Vich's testimony about pregnancy

Eubanks alleges trial counsel was ineffective for failing to object to testimony regarding the pregnancy of Eubanks's ex-girlfriend, Allessandra Vich, and that her testimony prejudiced the jury and tainted the jury deliberations. (ECF No. 43 at 51-54.) All reasonable jurists would agree the record belies this claim. The trial court overruled defense counsel's relevance objection to Vich's testimony that her pregnancy involved twins. (ECF No. 23 at 135-36.) Eubanks fails to establish any successful basis upon which trial counsel could have objected to Vich's testimony about her pregnancy. Eubanks's footnotes arguing that it was highly improbable Vich was pregnant when she met with Eubanks after his arrest (ECF No. 43 at 52 n.3) is inherently speculative. Eubanks also fails to establish any basis upon which counsel was deficient in failing to object to Jarvis's testimony that Eubanks told him he had "taken care of" his ex-girlfriend because she gave

1  deposition testimony against him. Ground 5(14) is thus dismissed as insubstantial.[8]

2  ### 9.    Ground 5(15)—Investigate Jackson

3  Eubanks alleges trial counsel was ineffective for failing to investigate co-defendant

4  Jackson's involvement in a homicide in Victorville and the true reasons underlying his

5  prison attack. (ECF No. 43 at 54-55.) Eubanks alleges the prosecutor mistakenly

6  represented that Jackson was attacked by other inmates due to Jackson's testimony

7  against Eubanks and Maxwell, as a basis for its request to depose Jackson pretrial. (*Id.*)

8  Eubanks alleges he was prejudiced by counsel's failure to investigate because, according

9  to an investigator's posttrial declaration (ECF No. 38-5 at 9-10), Jackson stated neither

10  Eubanks nor Maxwell was involved in the attack. (*Id.*)

11  Respondents contend Eubanks waived this claim by failing to identify any portion

12  of the trial transcript referencing the inmate attack and that he fails to establish the

13  information was admissible at trial or resulting prejudice. (ECF No. 72 at 49-50.) They

14  contend this claim should be dismissed as insubstantial as it is vague and conclusory.

15  (*Id.*) Moreover, they contend that Eubanks makes no argument about a homicide apart

16  from the heading for the claim. (*Id.*) They object to the Court's consideration of the

17  investigator's declaration, arguing it is not part of the state-court record and contains

18  hearsay. (*Id.*)

19  The allegations that trial counsel was ineffective for failing to investigate Jackson's

20  involvement in a homicide in Victorville are insubstantial. The record indicates trial

21  counsel requested discovery concerning the Victorville homicide. (ECF No. 21-2 at 3-15.)

22  Eubanks has not overcome the strong presumption trial counsel's investigation of that

23  incident or counsel's failure to question Jackson about it at trial, fell below an objective

24  standard of reasonableness or resulted in prejudice to Eubanks. Eubanks also fails to

25

26  [8]Eubanks submitted an affidavit of an investigator about her posttrial interview with
Vich and one of the jurors, and Vich's court documents. (ECF Nos. 32-2; 34-1; 35-2; 38-
27  5 at 2-3.) Respondents object to the Court's consideration of those documents. (ECF No.
72 at 48-49.) The Court need not determine whether it may consider those documents,
28  as they have no bearing on the Court's determination that Eubanks failed to establish a
substantial claim that trial counsel were deficient for failing to object to Vich's testimony.

1   establish counsel was deficient for failing to investigate the identity of the person

2   responsible for the attack on Jackson at the jail other than to oppose the State's request

3   to take Jackson's pretrial deposition. Jackson's deposition testimony was not admitted at

4   trial, and nothing indicates the attack on Jackson was mentioned to the jury. Ground 5(15)

5   is wholly without factual support and dismissed as procedurally defaulted.[9]

6                    **10.    Consideration of IAC Claims as a Whole**

7            Although IAC claims are examined separately to determine whether counsel was

8   deficient, *Strickland* instructs the purpose of the Sixth Amendment's guarantee of counsel

9   is to ensure "[c]riminal defendants receive a fair trial," "a defendant has the assistance

10  necessary to justify reliance on the outcome of the proceeding," and counsel's assistance

11  was "reasonable considering all the circumstances." *See Strickland*, 466 U.S. at 689, 692

12  (emphasis added). *See also Boyde*, 404 F.3d at 1176 ("We must analyze each of

13  [petitioner's] claims separately to determine whether counsel was deficient, but 'prejudice

14  may result from the cumulative impact of multiple deficiencies.'") (quoting *Cooper*, 586

15  F.2d at 1333); *Browning v. Baker*, 875 F.3d 444, 471 (9th Cir. 2017) ("While an individual

16  claiming IAC 'must identify the acts or omissions of counsel that are alleged not to have

17  been the result of reasonable professional judgment,' . . . the court considers counsel's

18  conduct *as a whole* to determine whether it was constitutionally adequate.") (internal

19  citation omitted). Here, on consideration of the merits of Eubanks's IAC claims taken

20  together, and even assuming he could overcome the procedural defaults of some of the

21  IAC claims, the Court concludes Eubanks does not show that, overall, trial counsel's

22  actions or omissions were deficient and prejudicial. Counsel's ineffective assistance in

23  failing to object to the illegal sentence was corrected. Eubanks did not demonstrate he

24  received constitutionally inadequate assistance of counsel denying him due process or a

25  fair trial.

26

27          [9]The Court finds it unnecessary to resolve whether it may consider the contents of
    the posttrial investigator's declaration containing Jackson's statements about the
28  individuals involved in his prison attack, as such facts have no bearing on the analysis
    Ground 5(15).

1    **F.      Ground 6—*Brady* Violation**

2           Eubanks alleges his rights to due process and a fair trial under the Fifth, Sixth, and

3    Fourteenth Amendments were violated by the State's suppression of material and

4    exculpatory evidence regarding (1) benefits received by jailhouse informants; (2)

5    informant histories of jailhouse informants and codefendants; and (3) information that

6    attorneys Buttell and Joerger represented codefendants, jailhouse informants, and the

7    surviving victim.[10] (ECF No. 43 at 55-66.) Eubanks relies on witness statements conveyed

8    to a posttrial investigator (ECF No. 38-5); court documents, including case summaries,

9    dockets, and transcripts; and prison-release information from the internet. (ECF Nos. 32-

10   3; 33; 33-1; 33-2; 34; 35; 35-3; 35-5; 35-6; 38-3; 38-6; 80-4.) Respondents argue Eubanks

11   fails to demonstrate the information was withheld before trial, that the information is

12   material and exculpatory or impeaching, or that there was a reasonable probability the

13   result of the trial would have been different if he had access to the information. (ECF No.

14   72 at 51-59.)

15          The claims in Ground 6 were raised in an untimely and successive state

16   postconviction review petition. (ECF Nos. 73-12 at 4-5, 17-56; 73-18.) The Nevada

17   Supreme Court's analysis as to whether Eubanks established good cause and actual

18   prejudice to overcome the procedural default of these *Brady* claims generally depended

19   on federal law. (ECF No. 73-18.) To the extent the state supreme court applied federal

20   law, Ground 6 is not procedurally defaulted. *See Cooper v. Neven*, 641 F.3d 322, 332-33

21   (9th Cir. 2011) (concluding application of Nevada's procedural bars to the petitioner's

22   *Brady* claims was not "independent" because "the Nevada Supreme Court explicitly relied

23   on its federal *Brady* analysis as controlling the outcome of its state procedural default

24   analysis").

25          Respondents object to the Court's consideration of the Nevada court Case

26   Summaries, the posttrial investigator's declaration, and other documents (ECF Nos. 32-

27   1, 32-2, 32-3, 33, 33-1, 33-2, 34, 34-1, 35, 35-1, 35-2, 35-3, 35-4, 35-5, 35-6, 38, 38-2,

28

---

[10]The Court subdivides Ground 6 for clarity.

38-3, 38-4, 38-5, and 38-6), on the grounds that, *inter alia*, Eubanks failed to diligently develop them as part of the state-court record. (ECF No. 72 at 62-63.) Because the state supreme court adjudicated the *Brady* claims on the merits such that the *Brady* claims are not procedurally defaulted (*see* ECF No. 73-18), the documents were submitted to the state courts for purposes of those *Brady* claims (*see* ECF No. 73-10), and Eubanks was diligent under § 2254(e)(2) (*see supra*, pp. 60, 63), the Court will consider the documents for the limited purpose of its review of the state supreme court's adjudication of the federal law basis for the *Brady* claims alleged in Ground 6.

### 1.     Standard under *Brady*

The suppression by the prosecution of evidence favorable to an accused violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith of the prosecutor. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963). "Evidence favorable to the accused" includes evidence that would help the defendant impeach a witness. *See Giglio v. United States*, 405 U.S. 150, 154-55 (1972). A *Brady* violation for failure to disclose evidence contains three components: (1) the evidence at issue is favorable because it is exculpatory or impeaching, (2) the State suppressed that evidence, and (3) the evidence was material or resulted in prejudice. *See Banks v. Dretke*, 540 U.S. 668, 691 (2004) (citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)).

"Evidence of a deal or promise of lenient treatment in exchange for a witness's testimony against a defendant may constitute evidence that must be disclosed under *Brady* . . .." *Hovey v. Ayers*, 458 F.3d 892, 916-17 (9th Cir. 2006) (citing *Giglio*, 405 U.S. at 154-55). "The deal or promise need not be express; failure to disclose an agreement or guarantee of leniency 'indicated without making a bald promise' also may violate *Brady*." *Id*. (quoting *United States v. Butler*, 567 F.2d 885, 888 n.4 (9th Cir. 1978)). "However, in the absence of a promise or deal, a witness's subjective belief that he might receive lenient treatment in exchange for testifying does not render perjurious his testimony that he received no promises that he would benefit from testifying." *Id.*

///

Evidence may be deemed "suppressed" for the purpose of *Brady* even where the prosecutor was unaware that others, acting on the government's behalf, had such evidence. *See Kyles v. Whitley*, 514 U.S. 419, 437 (1995); *see also Youngblood v. W. Virginia*, 547 U.S. 867, 870 (2006) (acknowledging suppression under *Brady* occurs even if impeachment evidence is "known only to police investigators and not to the prosecutor") (citation and quotation marks omitted). The prosecution is required to produce *Brady* and *Giglio* material to the defense whether or not the defendant requests any such evidence. *See Strickler*, 527 U.S. at 280.

"The prosecutor's obligation under *Brady* is not excused by a defense counsel's failure to exercise diligence with respect to suppressed evidence." *Amado v. Gonzalez*, 758 F.3d 1119, 1135 (9th Cir. 2014). "However, defense counsel cannot lay a trap for prosecutors by failing to use evidence of which defense counsel is reasonably aware for, in such a case, the jury's verdict of guilty may be said to arise from defense counsel's stratagem, not the prosecution's failure to disclose." *Id.* "In such a case, the prosecution's failure to disclose *Brady* or *Giglio* evidence would not 'deprive the defendant of a fair trial,'" *Id.* (citing *United States v. Bagley*, 473 U.S. 667, 675 (1985)).

Under *Brady's* suppression prong, if "the defendant is aware of the essential facts enabling him to take advantage of any exculpatory evidence," the prosecution's failure to bring the evidence to the direct attention of the defense does not constitute "suppression." *Raley v. Ylst*, 470 F.3d 792, 804 (9th Cir. 2006) (citation omitted). The Ninth Circuit has explained the fact that "records are available in the public record doesn't diminish the State's obligation to produce them under *Brady*"; however, there is no *Brady* violation if the defendant "has enough information to be able to ascertain the supposed *Brady* material on his own." *Milke v. Ryan*, 711 F.3d 998, 1017 (9th Cir. 2013). Thus, "[w]here a defendant doesn't have enough information to find the *Brady* material with reasonable diligence, the state's failure to produce the evidence *is* considered suppression." *Id.* at 1018. The Nevada Supreme Court has held that court records related to the disposition of various criminal cases involving witnesses cannot be withheld by the State because

1   they are a matter of public record. *See Rippo v. State*, 423 P.3d 1084, 1103-04 (2018).

2   "'The mere possibility that an item of undisclosed information might have helped

3   the defense, or might have affected the outcome of the trial, does not establish

4   "materiality" in the constitutional sense.'" *Barker v. Fleming*, 423 F.3d 1085, 1099 (9th Cir.

5   2005) (citing *United States v. Croft*, 124 F.3d 1109, 1124 (9th Cir. 1997) and quoting

6   *United States v. Agurs*, 427 U.S. 97, 109-10 (1976)). *See also e.g.*, *Smith v. Cain*, 565

7   U.S. 73, 76 (2012) ("We have observed that evidence impeaching an eyewitness may not

8   be material if the State's other evidence is strong enough to sustain confidence in the

9   verdict."); *Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (acknowledging that granting a writ

10  of habeas corpus "on the basis of little more than speculation" is improper). The question

11  of the materiality or prejudice of withheld evidence "must be analyzed 'in the context of

12  the entire record.'" *Benn v. Lambert*, 283 F.3d 1040, 1053 (9th Cir. 2002) (citing *Agurs*,

13  427 U.S. at 112). To determine prejudice, a court must "undertake a careful, balanced

14  evaluation of the nature and strength of both the evidence the defense was prevented

15  from presenting and the evidence each side presented at trial." *Bailey v. Rae*, 339 F.3d

16  1107, 1119 (9th Cir. 2003) (quoting *Boss v. Pierce*, 263 F.3d 734, 745 (7th Cir. 2001)

17  (stating such an approach is required by *Kyles,* 514 U.S. at 441-54)).

18   **2.    Ground 6(A)—Benefits to informants**

19   **a.    Ground 6(A)(1)—Jarvis**

20   Eubanks alleges the State failed to disclose that jailhouse informant Jarvis

21  received two benefits as a result of his testimony against Eubanks: (a) Eubanks's

22  prosecutor would posttrial testify at Jarvis's sentencing hearing for Jarvis's unrelated

23  firearm offense, about Jarvis's assistance against Eubanks, which resulted, in part, in

24  Jarvis receiving a suspended three-to-ten-year sentence; and (b) the investigation into

25  the death of Jarvis's brother would be reopened if Jarvis shared information he reportedly

26  learned from Eubanks with the prosecutor for Eubanks's case. (ECF No. 43 at 56-57.)

27   Jarvis sent two letters to Eubanks's prosecutor stating Eubanks confessed to

28  Jarvis that he killed Frasher. (ECF Nos. 27-19; 27-20.) Neither letter mentions Jarvis's

brother, Jarvis's pending charges, or requests anything in exchange for the information about Eubanks. (*Id.*) At trial, Jarvis testified he asked for nothing, and was promised nothing, in exchange for his trial testimony against Eubanks. (ECF No. 80 at 132.) Jarvis testified that one reason he came forward against Eubanks was that no one provided information about who was responsible for killing Jarvis's brother:

> Q. Is there any particular reason why you're testifying today?
> A. My brother was murdered about four years ago in Pahrump. The people that killed him never got caught. Just to hear him say that he stabbed that dude so hard the knife broke is just kind of sick. My brother never had nobody to come forward and testify on his behalf and let our family know what the truth was. And there was no justice in that case.
>
> They still haven't been caught, but there's a lot of people that do know what happened and I think the family deserves to know the truth.

(*Id.* at 153.) On cross examination, Jarvis testified he was awaiting sentencing in an unrelated case, and he was promised "nothing" for his "testimony." (*Id.* at 157.)

During Eubanks's state postconviction proceedings on his *Brady* claims, he submitted a case summary docket report for Jarvis's sentencing hearing that states, in pertinent part, the prosecutor for Eubanks's trial testified during Jarvis's sentencing hearing about Jarvis's assistance at Eubanks's trial and that Jarvis did not ask for, and was not promised, anything in return for the prosecutor's testimony:

> [Counsel for Jarvis] reviews that [Jarvis] helped assist the State in the Charles Eubanks trial. [Counsel for Jarvis] calls [the prosecutor for Eubanks's trial] to the stand. [The prosecutor for Eubanks's trial] is sworn in by the Clerk. [The prosecutor for Eubanks's trial] testifies to the help [Jarvis] gave during the Charles Eubanks trial and outlines the details of his testimony during the trial. [The prosecutor for Eubanks's trial] testifies that [Jarvis] placed himself in harm[']s way by testifying in the Eubanks trial. [The prosecutor for Eubanks's trial] continues to testify that he never promised [Jarvis] anything in return for his testimony and states that [Jarvis] never asked for anything.

(ECF No. 33-1 at 6.) Eubanks submitted during the state proceeding for the *Brady* claims a posttrial investigator's declaration (ECF No. 73-10 at 7) reporting that on January 19, 2017, that Jarvis told her a sergeant who had investigated the death of Jarvis's brother encouraged him take the information about Eubanks to the District Attorney, and the sergeant promised to reopen the investigation into the death of Jarvis's brother:

[J]arvis learned that Andrew Kaufman and other inmates were testifying against Eubanks. Jarvis was angry about his brother's unsolved murder and was looking for leniency with respect to his own charges. At the jail in Pahrump, Jarvis saw the sergeant who had previously investigated his brother's death. Jarvis shared with the sergeant details of what he heard on the streets about the individuals who were likely responsible for his brother's death. The sergeant informed Jarvis that the case was closed. Jarvis further shared information he reportedly learned from Eubanks. The sergeant encouraged Jarvis to take the information to [the prosecutor for Eubanks's case], and, in exchange, the sergeant promised to reopen the investigation of Jarvis' brother's death.

[J]arvis thereafter sent a letter to [the prosecutor for Eubanks's case], informing him that he had information about the Eubanks case. [The prosecutor for Eubanks's case] and [an investigator for the District Attorney's Office] pulled Jarvis out of the jail in Pahrump in order to meet with him at the DA's Office. Jarvis met with [the prosecutor for Eubanks's case] and/or [the investigator for the District Attorney's office] "two or three times" prior to giving his trial testimony. He was given a cigarette or two when he met with the prosecutor and his investigator.

[S]hortly after testifying at Eubanks' trial, and under the representation of court-appointed attorney Alan Buttell, Jarvis pleaded guilty to an unspecified gun charge carrying a possible three to ten year sentence. The State agreed not to argue enhancement for habitual offender. During Jarvis' sentencing hearing, Buttell called [the prosecutor for Eubanks's case] as a witness and questioned him for over an hour about Jarvis' assistance in the Eubanks matter. The judge reluctantly agreed to suspend Jarvis' three to ten year sentence, even voicing his concerns about the sentence on the record.

(ECF No. 38-5 at 7-8.) Eubanks did not submit declarations or affidavits from either Jarvis or the unnamed sergeant.

The Nevada Supreme Court determined Eubanks failed to show the State withheld evidence because the record belies a finding that Jarvis had an undisclosed arrangement for his testimony at Eubanks's trial:

Eubanks argues that he has shown good cause and prejudice because the State violated *Brady*, 373 U.S. 83. We disagree. A *Brady* claim requires a showing that the evidence is favorable to the claimant, the State withheld the evidence, and the evidence was material. *Huebler*, 128 Nev. at 198, 275 P.3d at 95. When a *Brady* claim is raised in an untimely postconviction habeas petition, showing that evidence was withheld generally establishes good cause and that evidence was material generally establishes prejudice in order to overcome the procedural bar. *Id.* A *Brady* claim raised in an untimely postconviction habeas petition must be raised within a reasonable time after the discovery or disclosure of the withheld evidence. *Id.* at 198 n.3, 275 P.3d at 95 n.3; *see also Gray v. Netherland*, 518 U.S. 152, 162 (1996) (observing that a *Brady* claim could be procedurally barred when the petitioner knew of the grounds but did not raise it in the first state petition). When the defense specifically requested the withheld evidence, the evidence is material if there is a reasonable possibility that the result would have been different if the evidence had been

disclosed. *Mazzan v. Warden*, 116 Nev. 48, 74, 993 P.2d 25, 41 (2000). However, when the defense did not request or only requested the withheld evidence generally, evidence is only material if there is a reasonable probability of a different outcome. *Id.* We review *Brady* claims de novo. *Id.* at 66, 993 P.2d at 36.

Eubanks first argues that the State withheld Detective [sic] Vitto's plan to testify favorably at Danny Jarvis's sentencing hearing. Jarvis was a jailhouse informant who testified that Eubanks boasted about the murder. The record belies that Vitto and Jarvis had an undisclosed arrangement. Each testified that Vitto had not promised Jarvis anything in exchange for his testimony, and Eubanks has not offered any evidence showing that a tacit deal was in place. *Cf. Akrawi v. Booker*, 572 F.3d 252, 262-64 (6th Cir. 2009) ("[T]he mere fact of favorable treatment received by a witness following cooperation is also insufficient to substantiate the existence of an agreement."). Eubanks has not shown that any evidence was withheld in this regard, and trial counsel was able to cross-examine Jarvis thoroughly on his motivations for testifying. Moreover, insofar as Eubanks argues that the existence of a deal could be inferred from the bare fact of Vitto's testifying favorably at Jarvis's hearing, such a claim on that ground was available to be raised in a timely petition because Jarvis was cross-examined at trial on his imminent sentencing, which occurred soon after and was a matter of public record. Eubanks has not shown a meritorious *Brady* claim in this regard and thus has not shown good cause. The district court therefore did not err in denying this claim without conducting an evidentiary hearing. *See Nilia v. State,* 124 Nev. 1272, 1300-01, 198 P.3d 839, 858 (2008) (providing that a petitioner is entitled to an evidentiary hearing when the claims asserted are supported by specific factual allegations that are not belied or repelled by the record and that, if true, would entitle the petitioner to relief).

(ECF No 73-18 at 2-4.)

### i.    Prosecutor's testimony at Jarvis's sentencing

"The government is free to reward witnesses for their cooperation with favorable treatment in pending criminal cases without disclosing to the defendant its intention to do so, *provided* that it does not promise anything to the witness prior to the testimony." *Akrawi*, 572 F.3d at 263. Jarvis and the prosecutor each testified Jarvis neither asked for, nor was promised anything, in exchange for his testimony at Eubanks's trial. It is reasonable to conclude that, without more, the prosecutor's testimony at Jarvis's sentencing hearing fails to establish a tacit agreement for the prosecutor's testimony at Jarvis's sentencing hearing was in place before or at the time Jarvis testified at Eubanks's trial. The Nevada Supreme Court was reasonable in its determination Eubanks fails to establish the State violated *Brady* by withholding it had an agreement, tacit or otherwise, to provide Jarvis with the prosecutor's testimony in Jarvis's unrelated criminal case in

1   exchange for testimony against Eubanks. Accordingly, Ground 6(A)(1)(a) is denied.

2   **ii.    Reopening investigation of brother's death**

3          The Nevada Supreme Court did not expressly address Eubanks's claim that the

4   State withheld that Jarvis benefitted from contacting the District Attorney with information

5   against Eubanks's case because an unidentified sergeant promised to reopen the

6   investigation into the death of Jarvis's brother. (ECF No. 73-18.) Because Eubanks raised

7   the claim with the Nevada Supreme Court (ECF No. 73-12 at 19-21), it is presumed the

8   claim was adjudicated on the merits. *See Johnson v. Williams*, 568 U.S. 289, 298 (2013)

9   (holding when a federal claim is presented to a state court, and the state court opinion

10  addresses some but not all of defendant's claims, a rebuttable presumption arises on

11  federal habeas review that the state court adjudicated the federal claim on the merits).

12         The Nevada Supreme Court does not appear to have overlooked the claim,

13  because it determined that "trial counsel was able to cross-examine Jarvis thoroughly on

14  his motivations for testifying." *See supra*, p. 77. And Eubanks did not move for

15  reconsideration of his state petition on the grounds the Nevada Supreme Court

16  overlooked this aspect of his claim. The presumption the claim was adjudicated on the

17  merits is therefore not overcome, and this Court affords deferential review of this aspect

18  of the claim under 28 U.S.C. § 2254(d). *See Johnson*, 568 U.S. at 293. *See also Early*,

19  537 U.S. at 8 (State courts need not be aware of or cite Supreme Court cases, "so long

20  as neither the reasoning nor the result of the state-court decision contradicts them").

21         At Eubanks's trial, Jarvis claimed he came forward because no one came forward

22  with information concerning the individuals responsible for his brother's death. *See supra*,

23  p. 75. Although trial counsel cross-examined Jarvis about his motivations for testifying,

24  Jarvis did not disclose that he was prompted and incentivized to provide information that

25  he claims to have obtained from Eubanks because a sergeant promised to reopen the

26  investigation into the death of Jarvis's brother. Because of the failure to disclose this

27  promise to the defense, the jury was left with the impression that Jarvis came forward

28  with the information because, as he testified at trial, he thought he was just helping the

District Attorney's Office out with information and because, in his brother's case, no one came forward with information. (ECF No. 80 at 155.)

Respondents contend the State did not violate *Brady* by withholding the promise to reopen the investigation into the death of Jarvis's brother because, according to the posttrial investigator's declaration, Jarvis had already voluntarily provided information about Eubanks to the sergeant before the sergeant made the promise to Jarvis. (ECF No. 72 at 53.) Respondents overlook that Jarvis did not have the same incentive to inform the District Attorney about the information he obtained from Eubanks without the sergeant first promising to reopen the investigation if Jarvis relayed the information to the District Attorney. The jury could have viewed Jarvis's credibility differently had they known he was prompted and incentivized to assist the District Attorney's Office by the sergeant's promise to reopen the investigation into the death of Jarvis's brother. Thus, it would be unreasonable for the state appellate court to conclude the State did not suppress evidence favorable to Eubanks.

It would, however, be reasonable for the state appellate court to conclude the State did not violate *Brady*, because, even on *de novo* review, *see Berghuis*, 560 U.S. at 390, such evidence does not place the whole case in such a different light as to undermine confidence in the verdict. *See Smith*, 565 U.S. at 76; *Kyles*, 514 U.S. at 435. Jarvis's credibility and motivations for his testimony against Eubanks were undermined by his testimony that he is a convicted felon, that he knew Frasher for more than five years, and that Frasher once paid part of the rent for Jarvis's girlfriend. *See supra,* p. 7. Jarvis's testimony that Eubanks confessed to killing Frasher and wished to have witnesses "taken care of," was echoed by Karisma. Eubanks's then girlfriend Vich testified Eubanks confessed he killed Frasher. Jackson testified Eubanks killed Frasher while Jackson stabbed Bell. Codefendant Rubio testified that on the day of the stabbings, Eubanks used a "slashing" motion across his neck while telling her Frasher and Bell were each, he assumed, dead. Jailhouse informant Dowling testified Eubanks claimed to have stabbed Frasher. *See supra*, pp. 2-3, 5-7.

Considering the relative nature and strength of the evidence that Jarvis was promised a reopening of the investigation into his brother's death if he came forward with information about Eubanks, alongside the evidence presented at trial, the Nevada Supreme Court could reasonably apply *Brady*, *Kyles*, and their progeny, and determine the State's withholding of the evidence, did not result in prejudice as there is no reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *See Bagley*, 473 U.S. at 682. *See also Kyles*, 514 U.S. at 434. Ground 6(A)(1)(b) is denied.

### b. Ground 6(A)(2)—Kaufman

Eubanks alleges the State failed to disclose it was a certainty, not a hope, that if Kaufman provided testimony against Eubanks, the United States Attorney would file a motion to reduce Kaufman's federal sentence. (ECF No. 43 at 58-60.) He alleges this was a certainty because such motions are rare, Kaufman received a significant benefit, and the State prosecutor likely assured Kaufman the motion would be filed. (*Id.*)

During a pretrial deposition, Kaufman testified he was sentenced by the United States District Court for the District of Nevada to multiple concurrent sentences of 48 months following his guilty plea to conspiracy and 13 convictions for illegal transfer of a Machine Gun: Aiding and Abetting. (ECF Nos. 21-19 at 44-48; 34 at 2.) Kaufman testified in pretrial deposition that he hoped the District Attorney would send a letter to the federal prosecutor about his assistance in Eubanks's case:

> Q. Now, were you promised anything for your testimony today?
> A. I was hoping that I could get a letter to the federal prosecution that might drop my sentence to 30—60 days or so.
> Q. All right. So what were you supposed to do?
> A. Just say the truth.
> Q. And what was I supposed to do in exchange for your truthful testimony?
> A. Write a letter on my behalf.
> Q. Because you're already under sentence, correct?
> A. Correct. I've been sentenced.

(ECF No. 21-19 at 44.) On cross-examination, Kaufman testified his attorney told him he

did not know if a letter would result in leniency for Kaufman's federal case:

> Q. Okay. So you're testifying here today, you told the State, because you want a letter to receive some leniency in your federal prosecution?
>
> A. If that's at all possible.
>
> Q. So you'll basically say anything the State wants you to say, right?
>
> A. No.
>
> Q. So it's not that big of a deal for you then to get that letter?
>
> A. I would—if it—if he don't get the letter, I don't know if it's going to work.
>
> Q. Because it's going to mean less time for you, right, at the end of the day?
>
> A. A lot of things have to go right for that to happen, but yes.
>
> . . . .
>
> Q. And you've had opportunity to speak with [your attorney] about what you're hoping happens, right?
>
> A. Correct, yes.
>
> Q. Did he paint a rosy picture, "Oh, yeah. That will work great." Or was it more like, "Hey, I don't know, man."
>
> A. It was more like, I don't know, man. Take your own chances with that.
>
> Q. But you're very hopeful that my letter to the federal prosecutor will get you some time off?
>
> A. Yes.

(*Id.* at 49-51.)  At trial, Kaufman reiterated his agreement with the State to provide a letter to the federal prosecutor about his cooperation in Eubanks's case, and that he hoped it would result in leniency in the federal case, but he did not know "how it exactly works":

> Q. [By the State] Now, you're in federal custody for a felony; is that correct?
>
> A. Correct.
>
> Q. In exchange for your testimony, I've agreed to tell the United States Attorney that you cooperated with the State; is that correct?
>
> A. Correct.
>
> Q. And you're hoping that that helps you, right?
>
> A. Hoping.
>
> Q. And what do you hope it will be able to accomplish for you?
>
> A. I'm hoping that the prosecutor could file something for the Judge to reduce my sentence. I don't know. I don't know how it exactly works.
>
> Q. And in exchange, what were you supposed to do in order for me to contact the United States Attorney and tell the United States Attorney how you cooperated?
>
> A. Give my truthful testimony.
>
> . . . .

Q. [By Defense Counsel]: [A]nd you stated that you did receive a benefit from—well, you're anticipating a benefit from the federal government in the form of a letter from [The State prosecutor], I presume, to the federal prosecutor in the federal case; is that correct?

A. That's correct.

(ECF No. 80-1 at 97-98, 100.)

The Nevada Supreme Court determined the State did not withhold information about Kaufman's agreement with the State in exchange for his testimony:

> Eubanks next argues that the State withheld evidence of a benefit that Andrew Kaufman received for his testimony. Kaufman was a jailhouse informant who testified that Eubanks admitted to committing murder and attempted murder. Kaufman testified in a pretrial deposition that, in exchange for his testimony, he expected the State to write a letter to federal authorities on his behalf describing his assistance. The State acknowledged this agreement, and trial counsel cross-examined him on the matter. Subsequent to Eubanks' trial, Kaufman's sentence on a federal case was reduced. Eubanks has not shown any agreement or benefit that was withheld. Eubanks' claim that it was certain, not merely hoped for, that Kaufman would receive relief from his federal sentence—beyond the letter from the State describing his cooperation—is a bare claim unsupported by the record. As Eubanks has not shown a meritorious *Brady* claim in this regard, the district court did not err in denying it as procedurally barred.

(ECF No 73-18 at 6-7.)

The Court finds that the Nevada Supreme Court was reasonable in its determination Eubanks has not shown that the State withheld benefits Kaufman received for his testimony. The State's agreement that, in exchange for Kaufman providing testimony in Eubanks's case, the State would provide a letter to the federal prosecutor for the purpose of obtaining a more lenient sentence for Kaufman's federal case, was disclosed and discussed during Kaufman's pretrial deposition and at Eubanks's trial. Eubanks contends the United States Attorney might have filed a Rule 35(b) motion before Kaufman provided his testimony at Eubanks's trial (ECF No. 43 at 59); however, that contention has no support in the record as, according to Kaufman's testimony, the State agreed to provide a letter after Kaufman testified at Eubanks's trial and, during the trial, Kaufman testified under oath that he was still hoping for a letter and a lenient outcome. (ECF No. 80-1 at 97.)

///

The Nevada Supreme Court also reasonably determined the contention that it was a certainty that Kaufman would receive a benefit is a bare claim unsupported by the record. Kaufman testified that his counsel for the federal case could not guarantee Kaufman would benefit by assisting the State with Eubanks's case. *See supra*, p. 81. As Kaufman stated, "A lot of things have to go right for that to happen." *Id.* That uncertainty is a function of overcoming three layers of discretion. First, the State prosecutor had to exercise discretion to send the federal prosecutor a letter. Second, under Fed. R. Crim. P. 35(b), before Kaufman could derive any benefit from providing substantial assistance, the United States Attorney would need to exercise his or her discretion to file a motion requesting the Federal District Court reduce Kaufman's sentence. *See United States v. Mulero-Algarín*, 535 F.3d 34, 38-39 (1st Cir. 2008) (recognizing that ample discretion is afforded to the prosecutor in deciding whether to file a Fed. R. Crim. P. 35(b) motion but recognizing a federal prosecutor cannot withhold a motion in a way that violates the constitution). Third, "[a] Rule 35 motion is essentially a plea for leniency and is addressed to the sound discretion of the district court." *United States v. Hooton*, 693 F.2d 857, 859 (9th Cir. 1982). Thus, the United States District Court had the final word whether Kaufman received a benefit for his testimony.

Accordingly, Ground 6(A)(2) is denied.

### 3. Ground 6(B)—Informant history

Eubanks alleges the State suppressed (1) a videotaped interview detailing Karisma's cooperation as a regular informant for Detective Boruchowitz and additional details of Karisma's involvement in Eubanks's case; (2) Jarvis was a confidential informant for Detective Meade; (3) Jackson "assisted the State with other cases involving drugs"; and (4) Garcia testified in 2007 against a codefendant boyfriend regarding a shooting into a Sheriff's vehicle, and the prosecutor for Eubanks's case was impressed with her testimony in that case. (ECF No. 43 at 60-62.)

The Nevada Supreme Court determined the evidence as to Karisma and Jackson was undisclosed, the information about Jarvis and Garcia could not be withheld by the

State as that information is contained in the public record, and none of the information concerning the four witnesses was material:

> Eubanks next argues that the State withheld evidence that Karisma Garcia, Troy Jackson, and Jarvis had previously worked as confidential informants in unrelated cases. [Karisma] was a jailhouse informant who testified that Eubanks admitted the murder to her. Jackson was Eubanks' coperpetrator who pleaded guilty. It appears the evidence as to [Karisma] and Jackson was not disclosed. The Jarvis claim is based on court minutes that are "matter[s] of public record that [were] not and could not be withheld by the State." *Rippo v. State*, 134 Nev. 411, 431-32, 423 P.3d 1084, 1103-04 (2018). Even if the Jarvis evidence had been withheld as well, the record shows that Eubanks did not specifically request this confidential-informant evidence, but only generally requested it, if at all. Accordingly, the evidence is material only if reasonably probable to lead to a different outcome.
>
> The evidence was not material as to any of these three witnesses. That Jarvis had assisted law enforcement in unrelated cases would offer only minor additional impeachment value, as he was already thoroughly impeached and evidence of other instances of Jarvis's past cooperation with law enforcement was not relevant to his truthfulness. *See United States v. Hamaker*, 455 F.3d 1316, 1328-29 (11th Cir. 2006) (finding no *Brady* violation where the additional impeachment value to be gained from questioning a witness on his status as a confidential informant in an unrelated case was at best marginal); *Pyles v. Johnson*, 136 F.3d 986, 1000 (5th Cir. 1998) (concluding that evidence of additional informant activities would provide only incremental impeachment value that did not meet the level of *Brady* materiality). Likewise, trial counsel cross-examined [Karisma] and Jackson in pretrial depositions on their motives and agreements with the State to testify, [Karisma]'s hoped-for benefit and Jackson's anticipation of none, and their criminal records. The confidential-informant evidence would offer minor incremental impeachment value as to [Karisma] and Jackson, as each had already been impeached on related grounds and additional, unrelated informant experience would not bear on their truthfulness. Also, Jackson's testimony regarding the attack was corroborated by physical evidence and the accounts of other witnesses and participants.
>
> Moreover, the incremental impeachment evidence was not material in light of the overwhelming evidence of Eubanks' guilt. That is, the record shows that (1) Eubanks confessed the murder to his girlfriend, four jailhouse informants, and two others who pleaded guilty to offenses related to the murder; (2) Eubanks' coperpetrator admitted to their crimes; (3) two children at the house where Eubanks fled after the killing described Eubanks throwing bags into a fire from which the murder weapons were later recovered; (4) the surviving victim's sister testified that Eubanks and his accomplices arrived at the house immediately before the murder and attempted murder; and (5) Eubanks admitted to the investigating detective that he went to the residence to rob the victims before the situation deteriorated when the victims had nothing of value. Eubanks has not shown meritorious *Brady* claims in these regards, and the district court therefore did not err in denying them as procedurally barred without conducting an evidentiary hearing.
>
> . . . .
>
> Eubanks next argues that the State withheld evidence that his

1
2
3
4
5
6
7
8
9

accomplice Victoria Garcia had testified against a codefendant in a previous unrelated case. Her prior testimony is a matter of public record that the State could not withhold. *Rippo*, 134 Nev. at 431-32, 423 P.3d at 1103-04. Even if it could have been withheld, noting that it was not specifically requested, there is not a reasonable probability that this evidence would have affected the outcome. Garcia drove Eubanks and Jackson to the surviving victim's residence where they committed the murder and the attempted murder. The fact that Garcia testified against a coperpetrator in an unrelated case was not material. Any motive to testify falsely would be illustrated by the lesser sentence she received for cooperation in this case and her relationship with Jackson—both of which were disclosed and elicited at trial. Moreover, whatever impeachment value this might offer is marginal in light of the overwhelming evidence of Eubanks's guilt and the corroboration of Garcia's testimony by physical evidence and other witnesses' testimony. Eubanks has not shown a meritorious *Brady* claim in this regard, and the district court therefore did not err in denying it as procedurally barred without conducting an evidentiary hearing.

10

(ECF No. 73-18 at 4-8.)

11

### a. Ground 6(B)(1)—Karisma

12

Eubanks alleges the State violated *Brady* by suppressing Karisma's videotaped

13

interview with the District Attorney that includes details about Karisma's history of

14

cooperation with authorities. (ECF No. 43 at 60-61.) He alleges, based on statements

15

Karisma made posttrial to an investigator, the State failed to disclose Karisma (1) was a

16

"regular informant in Nye County"; (2) worked in an undercover capacity conducting

17

controlled drug purchases for Detective Treavor Meade; (3) received $1500 for

18

information about a robbery involving 200 firearms; and (4) received frequent requests

19

for information from Detective Boruchowitz. (*Id.*) (*See also* ECF No. 38-5 at 3.) Eubanks

20

alleges, based on posttrial statements to an investigator, that the State suppressed

21

information about Karisma's involvement in Eubanks's case, i.e., (1) that Karisma was

22

housed with Eubanks a few different times; (2) Detective Boruchowitz told Karisma, "I

23

don't care what you say just say what you need to say to lock [Eubanks] up," and the

24

prosecutor replied, "Well, we don't need you to go that far . . ."; and (3) Karisma was

25

promised no prison time if Karisma delivered Eubank's list to the District Attorney. (*Id.*)

26

At pretrial deposition, Karisma testified that the district attorney recorded Karisma's

27
28

interview. (ECF No. 21 at 12-13.) On cross-examination by lead counsel,[11] Karisma testified that, just 10 minutes before giving testimony, Karisma saw that videotaped interview with the District Attorney. (*Id.* at 21-22.) Lead counsel showed Karisma a document that she identified as her "word for word" statement that she signed and that was "printed out after [Karisma] said it." (*Id.* at 22-23.) Karisma agreed the video testimony "would basically match up with everything in" that statement. (*Id.* at 23-24.) Karisma admitted that since 1997, she had incurred prior convictions for burglaries, robberies, forgeries, and possession of stolen properties in Nye and Clark counties, although "mostly" in Clark County. (*Id.* at 15-16.) Karisma admitted to being incarcerated and facing a robbery case. (*Id.* at 18-21, 27-28.)

At trial, Karisma testified to giving a video recorded interview with the District Attorney. (ECF No. 23 at 207-08.) Co-counsel for Eubanks, who did not participate in the pretrial deposition, indicated that while the tape may have been produced in discovery, the defense had only just received it. (*Id.* at 227-28.) The trial court offered to continue Karisma's testimony until the following week; however, co-counsel assured the court the defense had adequate time to review it before cross-examining Karisma the following day. (*Id.*) The next morning, however, co-counsel for the defense explained the videotape revealed Karisma was a professional informant who participated in several other cases, and the defense needed to investigate Karisma for adequate cross-examination. (ECF No. 80 at 15-17.) Co-counsel claimed the defense had not previously received the interview. (*Id.*)

The State argued it had a Certificate of Service dated May 31, 2012, as evidence that Karisma's interview was produced to the defense. (*Id.* at 20-23.) The trial court

---

[11]For Ground 6(B)(1), the Court notes Eubanks was represented by one attorney for pretrial proceedings and an additional attorney at trial. (ECF Nos. 21-25 at 2; 21-46 at 2.) Counsel for pretrial proceedings and at trial is referred to as "lead counsel" while counsel who represented him only for trial is referred as a "co-counsel." Co-counsel was not involved with pretrial: [BY CO-COUNSEL]: "Mr. Fischer is the lead counsel in this case. He's had the case. I wasn't involved in the pretrial issues that were raised in this case. I'm here to assist him in the trial." (ECF No. 80 at 6.)

confirmed a Certificate of Service dated June 1, 2012, for disclosure of the CD containing Karisma's interview was filed with the court. (*Id.*) The State argued it produced the interview to the defense six weeks before Karisma's deposition testimony on July 13, 2012, and lead counsel referenced the interview during Karisma's deposition. (*Id.* at 20-26.) The trial court denied a motion to continue the trial after concluding the defense knew about the interview and covered it during the deposition. (*Id.* at 25-26.)

Co-counsel for Eubanks elicited testimony that Karisma previously cooperated with law enforcement before Eubanks's case, "a lot of people have confessed a lot of stuff" to Karisma, and Karisma had at least five felony convictions:

> Q. You look like a person someone would confess a murder to?
>
> A. H-m, yeah. I've been in—I've been in—I've been in prison. A lot of people have confessed a lot of stuff to me.
>
> . . . .
>
> Q. Now, this isn't the first time that you've cooperated with the DA's Office, correct?
>
> A. I don't know. I don't understand your question.
>
> Q. Well, you've worked with law enforcement previously, right?
>
> A. I have.
>
> Q. Okay. So is it fair to say that you've cooperated with law enforcement by working with them?
>
> A. Well, sure. I went to them, yeah.

(*Id.* at 35, 38-39.)

The Nevada Supreme Court's determination the State withheld Karisma's videorecorded interview with the District Attorney is, by clear and convincing evidence contained in the state-court record, based on an objectively unreasonable determination of fact. 28 U.S.C. § 2254(d)(2), (e)(1). The state court record shows that, even assuming lead counsel did not receive it, lead counsel became aware of the existence of Karisma's recorded interview during Karisma's deposition. *See supra*, pp. 85-86. "When, as here, a defendant has enough information to be able to ascertain the supposed *Brady* material on his own, there is no suppression of the evidence." *See United States v. Aichele*, 941 F.2d 761, 764 (9th Cir. 1991). The jury was also aware Karisma had been an informant

before Eubanks's case. *See supra*, p. 87. However, Eubanks did not establish that the details of Karisma's work with Nye County Detectives, as set forth in the posttrial investigator's declaration, was undisclosed to the defense. Even assuming arguendo that such information was not disclosed, it is not necessarily impeaching, as there is no indication that Karisma lied to the police during cooperation in other cases. *See, e.g.*, *Maxwell v. Roe*, 628 F.3d 486, 511-12 (9th Cir. 2010) (holding informant's history material as it could have been used to discredit informant considering the importance of the testimony and it would have contradicted the portrayal of the informant as unsophisticated by showing the informant was experienced and had a history of lying). All objectively reasonable jurists would agree the State did not violate *Brady* by suppressing the videotaped interview. And even assuming the State was obligated to and failed to disclose Karisma's prior informant activities, as set forth in the posttrial investigator's declaration, that information was immaterial as it did not bear on Karisma's truthfulness and had only minor incremental impeachment value.

The Nevada Supreme Court did not directly address the allegations that the State suppressed information related to Karisma's involvement in Eubanks's case, as related in hearsay statements set forth in the posttrial investigator's declaration (ECF No. 38-5 at 3-4). Even assuming arguendo that the State was obligated to disclose that information, and withheld it, it is reasonable to conclude the alleged statements concerning Karisma's involvement in Eubanks's case, including the double hearsay attributed to Detective Boruchowitz, which could reasonably be construed as directing Karisma to focus on relaying information concerning only Eubanks's case to the exclusion of relaying information extraneous to that investigation, did not prejudice Eubanks as evidence independent of the testimony of Karisma and Detective Boruchowitz, was strong enough to sustain confidence in the verdict. *See supra*, pp. 2-8, 84. *See also Smith*, 565 U.S. at 76; *Kyles*, 514 U.S. at 435.

Accordingly, Ground 6(B)(1) is denied.

///

1

### b.    Ground 6(B)(2)—Jackson

2      Eubanks alleges that the State suppressed Jackson's assistance with other cases

3   involving drugs, and that Jackson worked as an informant for several law enforcement

4   officers in Nye County. (ECF No. 43 at 62.) To support this claim, he submits a minute

5   entry for Jackson's sentencing hearing in this case stating "[Jackson's counsel] argues

6   that [Jackson] has assisted the State with other cases involving drugs." (ECF No. 32-3 at

7   29.) Eubanks also relies on the posttrial investigator affidavit, stating that Jackson told the

8   investigator he "worked as an informant for several law enforcement officers and in Nye

9   County." (ECF No. 38-5 at 9.)

10      The Nevada Supreme Court was objectively reasonable in its determination the

11   information about Jackson's assistance in unrelated cases is immaterial. As discussed, a

12   witness's prior cooperation with law enforcement in unrelated cases is not necessarily

13   impeaching and could even be construed as supporting that witness's credibility. And,

14   although Jackson was an important witness who gave conflicting statements, given the

15   marginal nature and strength of evidence that Jackson had cooperated with the Sheriff in

16   unrelated drug cases, compared to his testimony in which he either lied to the Sheriff or

17   lied at trial about the facts involved in Eubanks's case, there is no reasonable probability

18   the result of the proceeding would have been different had information that Jackson

19   cooperated with law enforcement in other cases been disclosed to the defense. *See*

20   *Bagley*, 473 U.S. at 682; *Kyles*, 514 U.S. at 434. Ground 6(B)(2) is denied.

21

### c.    Ground 6(B)(3)—Jarvis

22      Eubanks alleges the State suppressed Jarvis's assistance as a confidential

23   informant for Nye County Detective Trevor Meade. (ECF No. 43 at 62.) Eubanks has not

24   established that Jarvis worked as a confidential informant. Based on the minutes dated

25   August 20, 2012, from Jarvis's then pending criminal case, Jarvis attempted to dismiss

26   his counsel because Jarvis "was going to," work as a confidential informant for Detective

27   Meade, but nothing establishes Jarvis did so. (ECF No. 33-1 at 4.) The following year, at

28   Eubanks's trial, Jarvis unequivocally testified he had never worked with law enforcement:

Q: Do you make it a habit of helping the District Attorney out?

. . . .

A: No, I don't.

Q: So this is just a one-time thing?

A: That's correct.

Q: You've never worked with law enforcement before?

A: No, sir, I haven't.

(ECF No. 80 at 155.) The record belies the claim that Jarvis worked with law enforcement before Eubanks's trial. As there is no meritorious *Brady* claim, Ground 6(B)(3) is denied.

### d.    Ground 6(B)(4)—Garcia

Eubanks alleges the State suppressed favorable and material evidence that Garcia previously testified against her codefendant ex-boyfriend in an unrelated case in 2007 and that the prosecutor for Eubanks's case stated he was "impressed with her testimony" in that case. (ECF No. 43 at 62.) The Nevada Supreme Court was reasonable in its determination that the information concerning Garcia's prior conviction and sentencing in an unrelated 2007 case is immaterial. *See supra*, p. 84-85. Garcia's motive to testify falsely at Eubanks's trial was illustrated by her relationship with Jackson and her receipt of a lesser sentence for her role in the crimes in exchange for her cooperation against Eubanks. Each of these motivations was disclosed and elicited at trial. None of the information about the 2007 case constitutes impeachment, as it has no bearing on Garcia's truthfulness at Eubanks's trial or on her credibility as a witness. The Nevada Supreme Court reasonably determined this is not a meritorious *Brady* claim. Ground 6(B)(4) is denied.

### 4.    Ground 6(C)—Conflicts of interest

Eubanks next alleges the State failed to disclose conflicts of interest that "could have been used to impeach the credibility" of witnesses at trial, i.e., (1) attorney Buttell represented codefendant Garcia and jailhouse informant Jarvis at the time that Garcia testified at Eubanks's trial, and Jarvis deflected Garcia's involvement in the crimes; (2) attorney Joerger represented jailhouse informants Karisma and Dowling on matters related to and/or pending when they testified against Eubanks, and represented the

victim, Bell, on matters related to and/or pending when Bell testified against Eubanks,

and had represented Jarvis in 2008; and (3) the codefendants and informants had contact

while in custody. (ECF No. 43 at 64-66.) He alleges the Nye County District Attorney's

Office was aware of, and involved in, the cases, and had a duty under *Brady* to disclose

these relationships and contacts. (*Id.*)

### a.    Ground 6(C)(1)—Attorneys

Respondents argue Eubanks fails to demonstrate Buttell and Joerger's

representation of witnesses at Eubanks's trial constitutes favorable evidence, that it was

withheld exculpatory or impeachment evidence, or that the result of the proceedings

would have been different had it been disclosed to the defense. (ECF No. 72 at 57-58.)

They argue there is no *Brady* violation for failing to disclose case summaries of court

dockets that are in the possession of the court, not the State, as those case summaries

are publicly available, and the allegations against the attorneys are unsupported

speculation. (*Id.*)

The Nevada Supreme Court determined such evidence was neither favorable nor

material, in that it does not bear on the truthfulness of the witnesses' testimony, and

allegations that the attorneys shared information with their clients is speculation:

> Eubanks next argues that the State withheld evidence of a conflict of
> interest in that the same attorney had represented Garcia and Jarvis and
> another had represented Garcia and another jailhouse informant. This
> evidence is neither favorable nor material. Eubanks does not allege that this
> created an actual conflict of interest adversely affecting *his* counsel's
> performance, *Leonard v. State*, 108 Nev. 79, 81, 824 P.2d 287, 289 (1992),
> and the mere fact of this representation does not bear on the truthfulness
> of their testimony. Further, it is not clear that the State possessed or
> withheld this evidence. Insofar as Eubanks suggests that these attorneys
> synced their clients' testimony against him, evidence of any such conspiracy
> is not within the State's possession and is mere speculation. Eubanks has
> not shown a meritorious *Brady* claim in this regard, and the district court
> therefore did not err in denying it as procedurally barred without conducting
> an evidentiary hearing.

(ECF No. 73-18 at 8.)

The Nevada Supreme Court's determination that the evidence of the attorneys'

relationships with witnesses was neither favorable nor material is objectively reasonable.

Without more, such evidence has no bearing on the credibility of those witnesses. Eubanks's claims that attorneys Buttell and Joerger could have shared unspecified information about Eubanks's case amongst their clientele who were witnesses at Eubanks's trial is speculation. The Nevada Supreme Court reasonably determined this is not a meritorious *Brady* claim. Ground 6(C)(1) is denied.

### b. Ground 6(C)(2)—Custodial contact

Eubanks alleges, based on hearsay statements contained in the posttrial investigator's affidavit (ECF No. 38-5), that the State was obligated to inform the defense that codefendant Maxwell was housed in the same unit as Jarvis and directly next to Karisma, that Maxwell told Jarvis to tell Eubanks to send him a kite so they "could get together on their stories," and Karisma approached Maxwell for information on at least one occasion. (ECF No. 43 at 65.) He alleges the State was obligated to inform the defense the male and female witnesses were often housed in the same unit at the jail, in the same holding cell at the courthouse, and/or transported to the courthouse together. (*Id.*) He further alleges the State was obligated to inform the defense that Garcia and Rubio regularly interacted while in the same jail, were held in the same cell at the courthouse for hearings, and that Maxwell believes Rubio and Garcia "got together on their stories." (*Id.*) He contends the State was obligated to inform the defense that the co-defendants had pretrial contact with the prosecutor and the Nye County District Attorney's Office where they discussed the case and the codefendants were provided cigarettes, food, and drinks, and, according to Rubio's hearsay statement, "[The DA's Office] bought us." (*Id.* at 65-66.) He argues the State was obligated to disclose to the defense that all the incarcerated witnesses were held in the same holding cell while waiting to testify at trial during which they discussed their stories and that after the trial they were all given pizza for dinner. (*Id.*) And he argues the State was obligated to disclose that jailhouse informants Kaufman and Jarvis were placed in the same pod at the jail before Kaufman's testimony, that an officer told Kaufman that Jarvis "is on the same case as you," and Kaufman and Jarvis spoke with each other and learned they were both testifying against

Eubanks. (*Id.*)

Respondents argue that information about conversations between the witnesses and where they were housed could not be disclosed because the State did not possess that information, and the defense cross-examined the witnesses during their pretrial depositions about their contacts with one another. (ECF No. 72 at 58-59.)

The Nevada Supreme Court determined the record belies the State withheld evidence about the witnesses' contacts with one another while in custody, in transport, and in detention, because the witnesses were cross-examined about it during pretrial depositions, further finding that Eubanks speculates the witnesses collaborated on their accounts without demonstrating the State possessed or withheld such evidence:

> Eubanks next argues that the State withheld evidence regarding contacts between witnesses while in custody. The witnesses were cross-examined in pretrial depositions on their contacts with one another while in custody, in transport, and in detention before court proceedings in this matter. The record thus belies that the State withheld any evidence in this regard. While Eubanks speculates that the witnesses may have collaborated on their accounts during these contacts, he has not alleged that the State possessed or withheld any actual evidence of any purported collaboration. Moreover, the evidence of the witnesses' contacts was not material. The record contains overwhelming evidence of Eubanks' guilt and the allegedly withheld evidence offered only marginal additional impeachment value in light of the witnesses' impeachment by the substantial charging benefits each received or hoped to receive. Eubanks has not shown a meritorious *Brady* claim in this regard, and the district court therefore did not err in denying it as procedurally barred without conducting an evidentiary hearing.

(ECF No 73-18 at 8-9.)

The record supports the state supreme court's conclusion that the parties were aware the codefendants had multiple opportunities to speak with each other and Eubanks fails to establish the State was aware of any collaboration or coordination of the witness's stories. There was evidence that, before the police arrived at Maxwell's residence, each of the codefendants, Eubanks included, agreed to claim they never left the house that day. Later, Jackson, Maxwell, Garcia, and Rubio, were present at the preliminary hearing proceedings where the surviving victim Bell, Detectives Boruchowitz and Eisenloffel, and others, testified about the circumstances surrounding the crimes. (ECF Nos. 79 at 2-5;

79-1 at 2-5; 79-2 at 2-5; 79-3 at 2-5.) Eubanks was not present at the preliminary hearing because he waived preliminary hearing. *See supra* p. 10. The codefendants were present for pretrial depositions of Jackson and Garcia. (ECF No. 79-4 at 5-9.)

At his deposition, Jackson testified he had conversations with Eubanks and Maxwell while in custody. (ECF No. 79-4 at 96-97, 104-05.) At her deposition, Garcia testified that, while she was in custody, she had a chance to visit with "all" of her codefendants. (*Id.* at 65-66.) She testified she was "housed" with Rubio and "on transport sometimes they're next to us in the transport, but other times they're like in the front so we can't contact them." (*Id.*) At trial, Garcia testified she met with the prosecutor regarding her testimony. (ECF No. 80 at 124, 127.) Rubio identified at trial her phone call from the jail to her sister, Amber, Maxwell's wife, in which Garcia can be heard in the background, and testified that Garcia asked Rubio to ask Amber questions about the evidence they attempted to destroy in the firepit and hide in a speaker. (ECF No. 80-1 at 33-35.)

Eubanks presents an investigator's posttrial declaration containing hearsay that Maxwell claimed he told Jarvis to tell Eubanks to send him a kite so they "could get together on their stories," Karisma approached Maxwell for information on at least one occasion, Maxwell believed Garcia and Rubio coordinated their stories, and jailhouse informants Kaufman and Jarvis were placed in the same pod at the jail before Kaufman's testimony, where they learned they were each testifying against Eubanks. (ECF No. 38-5 at 5-6, 9.) Eubanks has not, however, established the State ever possessed that information and Jarvis testified he was housed with Kaufman. Eubanks alleges that, according to Rubio's statements to the posttrial investigator, "They [the DA's Office] bought us." (*Id.* at 6.) This statement could be reasonably construed as a reference to the benefits the codefendants received under their plea agreements in exchange for their truthful testimony, all of which was disclosed to the defense and discussed during their trial testimony and does not establish the State suppressed benefits given to witnesses.

Eubanks alleges that, according to Rubio's statement to the posttrial investigator, the State withheld that it provided the codefendants with cigarettes, food, and drinks.

(ECF No. 38-5 at 6.) Codefendant Rubio gave pretrial deposition testimony that the prosecutor promised her two cigarettes. (ECF No. 21-19 at 87.) Information that the State gave the codefendants food, drinks, and cigarettes, even if withheld, has little impeachment value compared to impeachment by virtue of the substantial benefits the codefendants received, hoped to receive, or the sentencing averted, in exchange for their testimony.

Accordingly, Eubanks is not entitled to federal habeas relief on Ground 6(C)(2).

### c.    Ground 6(C)(3)—Cumulative *Brady* Error

The Supreme Court of Nevada rejected Eubanks's argument that the cumulative impact of any of the alleged withheld evidence warrants relief:

> Eubanks next argues that the cumulative impact of any withheld evidence would have affected the trial's outcome. We disagree. *See Lisle v. State*, 113 Nev. 540, 548, 937 P.2d 473, 478 (1997) (considering the cumulative effect of withheld evidence); *see also Kyles v. Whitley*, 514 U.S. 419, 437 (1995) (providing that the "net effect" of undisclosed evidence should be considered in assessing materiality). Eubanks has identified only marginal additional impeachment evidence that was not specifically requested, even if the matters of public record are considered as well. Each of the witnesses addressed had already been impeached with evidence more probative of their motivation to testify truthfully in this matter and with their criminal records. In no instance does Eubanks put forward withheld impeachment evidence that contradicts any of these witnesses' accounts. Moreover, this incremental impeachment evidence is not material in light of the overwhelming evidence of Eubanks' guilt. Eubanks has not shown a meritorious *Brady* claim in this regard, and the district court therefore did not err in denying it as procedurally barred without conducting an evidentiary hearing.

(ECF No 73-18 at 9.) Ground 6(C)(3) is denied as the Nevada Supreme Court's determination is neither contrary to nor constitutes an unreasonable application of clearly established federal law as determined by the Supreme Court and is not based on an unreasonable determination of fact considering the evidence in the state proceedings. However, the Court will issue a COA on this ground.

### G.    Ground 7—Cumulative Error

Eubanks alleges he was deprived of his constitutional right to a fair trial due to the cumulative effect of errors alleged in the Petition. (ECF No. 43 at 66-67.) The Court previously decided that Ground 7 will be considered. (ECF No. 67 at 7.) "[T]he combined

96

1  effect of multiple trial court errors violates due process where it renders the resulting

2  criminal trial fundamentally unfair." *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007).

3  "The cumulative effect of multiple errors can violate due process even where no single

4  error rises to the level of a constitutional violation or would independently warrant

5  reversal." *Chambers v. Mississippi*, 410 U.S. 284, 290 n.3 (1973). Ground 7 is denied

6  because the cumulative effect of any errors did not result in a fundamentally unfair trial.

7  **V.   CERTIFICATE OF APPEALABILITY**

8         This is a final order adverse to Eubanks. Rule 11 of the Rules Governing Section

9  2254 Cases requires the Court to issue or deny a certificate of appealability ("COA"). The

10  Court has therefore *sua sponte* evaluated the claims within Eubanks's Petition for

11  suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281

12  F.3d 851, 864-65 (9th Cir. 2002). "To obtain a COA under § 2253(c), a habeas prisoner

13  must make a substantial showing of the denial of a constitutional right," and for claims

14  rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find

15  the district court's assessment of the constitutional claims debatable or wrong." *Slack v.*

16  *McDaniel*, 529 U.S. 473, 483-84 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 &

17  n.4 (1983)). For procedural rulings, a COA will issue if reasonable jurists could debate

18  whether (1) the petition states a valid claim of the denial of a constitutional right; and (2)

19  this Court's procedural ruling was correct. *See id*. Applying this standard, a COA is

20  warranted for Grounds 5(3), 5(7), 5(9), and 6(C)(3) of the Petition because reasonable

21  jurists could find the court's assessment of the constitutional claims debatable or wrong,

22  and a COA is warranted for Ground 5(9) as reasonable jurists could debate whether the

23  Petition states valid claims of the denial of a constitutional right, and whether this Court's

24  procedural ruling is correct. A certificate of appealability is not warranted for other

25  Grounds in the petition. *See Slack*, 529 U.S. at 484.

26  **VI.   CONCLUSION**

27         The Court notes that the parties made several arguments and cited to several

28  cases not discussed above. The Court has reviewed these arguments and cases and

1    determines that they do not warrant discussion as they do not affect the outcome of the
2    issues before the Court.

3         It is therefore ordered that Petitioner's Third Amended Petition (ECF No. 43) is
4    denied.

5         It is further ordered that all requests for an evidentiary hearing are denied.

6         It is further ordered that a certificate of appealability is granted for Grounds 5(3),
7    5(7), 5(9), and 6(C)(3) of the Third Amended Petition and a certificate of appealability is
8    denied for all other grounds.

9         The Clerk of Court is directed to substitute Jeremy Bean for respondent Renee
10   Baker.

11        The Clerk of Court is further directed to enter judgment accordingly and close this
12   case.

13        DATED THIS 22nd Day of January 2024.

14

15                                            MIRANDA M. DU
16                                            UNITED STATES DISTRICT JUDGE

17

18

19

20

21

22

23

24

25

26

27

28